## CHICAGO, INDIANAPOLIS AND LOUISVILLE RAILWAY COMPANY *v.* RAILROAD COMMISSION OF INDIANA.

[No. 21,314. Filed April 8, 1909. Rehearing denied February 23, 1910.]

1. RAILROADS.— *Rates.— Unjust.— Relief from, by Companies.—* Railroad rates are required by law to be just (§5533 Burns 1908, Acts 1907, p. 454, §3, subd. d), and when unlawfully fixed, either by the companies or by the railroad commission, relief can be secured through a proper suit in court (§5536 Burns 1908, Acts 1907, p. 454, §6). p. 472.

2. RAILROADS.— *Rates.— Railroad Commission.— Interstate Commerce.—* An order of the Railroad Commission of Indiana fixing the freight rates for transporting cars from LaFayette to a gravel-pit near by is not void as an attempted regulation of interstate commerce. p. 472.

3. COMMERCE.—*Interstate Commerce Commission.—Jurisdiction.—* The Interstate Commerce Commission has no jurisdiction over commerce which is exclusively intrastate. p. 474.

4. APPEAL.—*Moot Questions.—*The courts will not decide moot questions. p. 475.

5. CONSTITUTIONAL LAW.— *Railroads.— Rates.— Classification.— Railroad Commission.—*Subdivision j, §5533 Burns 1908, Acts 1907, p. 454, §3, providing that "none of the provisions of this act [with certain exceptions] shall apply to any carrier unless or until the aggregate receipts for the carriage of freights on the carrier's line shall amount to thirty-three and one-third per cent, or more, of the gross receipts of the business of such carrier for the year preceding the filing of its last annual report as required by this act"—the railroad commission act—does not grant unequal privileges, and is a valid classification, the exception practically covering the interurban railroads. p. 475.

From Superior Court of Tippecanoe County; *Henry H. Vinton,* Judge.

Suit by the Chicago, Indianapolis and Louisville Railway Company against the Railroad Commission of Indiana. From a judgment for defendant, plaintiff appeals. *Affirmed.*

*E. C. Field, H. R. Kurrie, J. F. McHugh* and *Taylor & Woods,* for appellant.

*C. V. McAdams,* for appellee.

HADLEY, J.—The material facts underlying this proceeding are as follows:

The LaFayette Gravel and Concrete Company operates a gravel-pit near the railroad of appellant, hereinafter designated as the Monon, two and one-half miles south of the city of LaFayette. At LaFayette there are three other railroads running through the city, which intersect, and exchange business with, the Monon. The principal business of the gravel company is to quarry gravel, and ship it to various points in Indiana and other states. When the gravel plant was established, the Monon made a rate for picking up empty cars at LaFayette from each of said other three roads, hauling them to the gravel-pit, and returning them when loaded.

In 1907, the LaFayette Gravel and Concrete Company filed its complaint with the appellee, in which it alleged that the rate for hauling cars to and from other lines in LaFayette was excessive, and should be reduced. A hearing was had on the complaint, and on October 7, 1907, appellee made an order reducing said rate, and ordered that appellant should charge for said service not exceeding $5 for a single car movement, $4 for a two-car movement, and $3 per car for a movement of three or more cars, said rate to continue for two years. Within thirty days from the date of the final order of appellee the Monon instituted this suit in the Superior Court of Tippecanoe County, challenging the validity of said order.

It is averred in the complaint that before the filing thereof the appellee had, after notice, etc., reduced the charges appellant had for a long time been making for the delivery of gravel, in car-load lots, from the gravel-pit of said concrete company to said several railroads in the city of LaFayette, and had previously ordered appellant not to charge for said service a sum exceeding $5 for a single car movement, $4 per car for a two-car movement, and $3 per car for the movement of three or more cars; that the actual cost of the service, in hauling empty cars from the connecting points on said other roads in the city of LaFayette, and returning the loaded cars to said other roads in said city, is more than the appellee, by its said order, authorizes the appellant to charge; that the actual cost in wages, to those necessarily engaged in operating the locomotive required to haul said cars is $4 in a single car movement, and in addition thereto the appellant is required to use its own track and equipment, and furnish the water and fuel necessary to said movement; that if the appellant is required to obey said order, and perform service for the sums specified, it will be at an actual loss to the appellant, and contrary to section 1 of the 14th amendment to the Constitution of the United States, and to article 1, §§21, 23, and article 3, §1, of the Indiana Constitution.

Appellee's demurrer to the complaint for insufficiency of facts was overruled, and the issue was closed by answer in general denial. There was a trial by the court, and a judgment affirming the final order of the Railroad Commission of Indiana.

Appellant assigns as error the overruling of its motion for a new trial.

All the constitutional questions presented in this case are ruled adversely to appellant's insistence by the decision in *Southern Ind. R. Co.* v. *Railroad Com., etc.* (1909), 172 Ind. 113.

The question relating to the right of appellant to present

in this suit, commenced in the Superior Court of Tippecanoe County within thirty days from the making of the order complained of, any defense it may have addressed to the validity of said order is ruled in its favor by the decision in the case just cited, and we will content ourselves here by further remarking, that it is really of little consequence in this case whether the power conferred upon the Railroad Commission of Indiana is termed administrative, legislative or judicial—about which courts seem to differ. It is certain enough that the statute creating the commission (§5533 Burns 1908, Acts 1907, p. 454, §3, subd. d), requires the freight rates of a railroad company to be just, reasonable and undiscriminative, and when unlawfully fixed by either the railroad company or by the commission, on complaint they may be challenged and overthrown by compliance with the provisions of section six of said act (§5536 Burns 1908, Acts 1907, p. 454), as appellant has done in this case. *Reagan* v. *Farmers Loan, etc., Co.* (1894), 154 U. S. 362, 367, 14 Sup. Ct. 1047, 38 L. Ed. 1014; *Chicago, etc., R. Co.* v. *Railroad Com., etc.* (1906), 38 Ind. App. 439.

Appellant also claims that the order of the commission is void, because it relates to interstate commerce. We are not favored with a copy of the order, or with a statement of its contents, in either the briefs or the record. Hence, in considering its scope, we will assume it was no broader than the averments of the complaint.

Concerning the order, the complaint contains the following allegations: "That when said gravel and concrete plant was established, this plaintiff company established a rate *for the movement of cars from said plant to other lines of railway in the city of LaFayette, and from said lines of railway to said plant;* that heretofore, and after said rates were established, said gravel and concrete company filed its complaint with the Railroad Commission of Indiana, in which it was charged that *said rates for said service of transporting cars to and from other lines in the city of LaFayette were*

NOVEMBER TERM, 1909.          473

Chicago, etc., R. Co. *v.* Railroad. Com., etc.—173 Ind. 469.

*excessive and should be reduced;* that afterwards, such proceedings were had upon said petition that on October 7, 1907, the said Railroad Commission of Indiana did reduce the charges of this plaintiff company as established by it as before averred, and ordered that this plaintiff company should charge not exceeding $5 for a single car movement, $4 per car for a two-car movement, and $3 per car for the movement of three or more cars, said rate to apply to the delivery of gravel in carloads *from the plant of said company to connecting lines in LaFayette for a period of two years beginning October 15, 1907."* (Our italics.)

These averments of the complaint, aided by the evidence that appellant offered in support thereof, make it plain that the reduction involved in the order of the commission relates to a rate that had been previously established for the movement of cars between the gravel plant located on its line to the connecting points of certain intersecting railroads at LaFayette.

As explained by appellant's witness, appellant furnished no equipment, but would pick up the empty cars from the other roads in LaFayette, haul them to the plant, and, when loaded, haul them back, and deliver them to said other roads. The rate previously established by appellant, and as reduced by the commission, was a fixed sum per car.

There is nothing in the case to show that appellant issued any bill of lading to destination points, or that it was in any way liable for, or concerned in, the movement of the cars out of LaFayette on the rails of such other roads. In fine, so far as appears, the service rendered by appellant was, in nature, the same as if it had drawn the cars to and from the gravel-pit with horses, for a stipulated sum per car, and the service being confined to the handling of cars between two points in the same state is not within the purview of interstate commerce.

The proviso in the first section of the act to regulate commerce, known as the Hepburn act, of June 29, 1906, reads as

follows: "Provided, however, that the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property wholly within one state and not shipped to or from a foreign country from or to any state or territory." 34 Stat. U. S., p. 584.

The provisions of the act of congress need no interpretation, but their meaning has been often declared by the Interstate Commerce Commission and other jurisdictions.

3. *New Jersey Fruit Exch.* v. *Central R. Co.* (1888), 2 Int. Com. Rep. 142; *Farmers, etc., Club* v. *Atchison, etc., R. Co.* (1907), 12 Int. Com. Rep. 351, 355; *Hastings Malting Co.* v. *Chicago, etc., R. Co.* (1906), 11 Int. Com. Rep. 675; *Ex parte Koehler* (1887), 30 Fed. 867; *Central Trust Co.* v. *Pittsburgh, etc., R. Co.* (1906), 101 N. Y. Supp. 837, 52 Misc. 195; *Gulf, etc., R. Co.* v. *Texas* (1907), 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540; *Larabee Flour Mills Co.* v. *Missouri Pac. R. Co.* (1906), 74 Kan. 808, 88 Pac. 72.

·In the case of *New Jersey Fruit Exchange* v. *Central R. Co., supra,* it is said: "As the transportation by the carriers is wholly within the State of New Jersey, the commission has no jurisdiction."

In the case of *Farmers, etc., Club* v. *Atchison, etc., R. Co., supra,* it is said: "These rates from the field to the Missouri river are entirely within the State of Kansas and entirely within the control of that commonwealth."

In the case of *Ex parte Koehler, supra,* the court referred to the same question and said that the interstate commerce act "does not include the carriage or handling of property by rail or otherwise, when such carriage and handling are performed wholly within a state, unless the same is directly shipped to or from a foreign country, from or to such state."

No question concerning the authority of the commission to fix switching charges arises in this case in the absence of a copy of the order, or some averment in the complaint that

the commission had attempted to fix such rates. Besides, appellant was at the pains to prove that the gravel plant was one-half mile outside the switch limits of the city of La-Fayette, and that each car movement was controlled by the general train dispatcher, and not by the yardmaster, and that the mileage covered by each car movement, in hauling the same from LaFayette to and from the gravel plant, weighing and turning over to the proper railroad, 4. was twenty-two and one-half miles. We cannot decide a moot question.

We find no error in the record. Judgment affirmed.


## ON PETITION FOR REHEARING.

HADLEY, C. J.—Appellant, in its petition for a rehearing, complains that we did not, in the original opinion, consider the constitutional question presented to a clause in 5. subdivision j of section three of the act of 1905 (Acts 1905, p. 83), as amended in 1907 (Acts 1907, p. 454, §3, §5533 Burns 1908), relating to the power of the railroad commission to regulate the carrying of freights by certain railroads. The clause in question reads as follows: "None of the provisions of this act except as specified in this paragraph in any way relating to freight, freight tariffs, or the delivery or distribution of freight-cars, or the construction of sidings, turnouts or connections for the use or operation of freight-cars, shall apply to any carrier unless or until the aggregate receipts for the carriage of freights on the carrier's line shall amount to thirty-three and one-third per cent, or more, of the gross receipts of the business of such carrier for the year preceding the filing of its last annual report as required by this act."

Appellant affirms that this provision is in violation of the equal-protection clause of the federal Constitution. The provision objected to, in a little more condensed form, may be stated thus: None of the provisions of the railroad commis-

sion act, in any way relating to the carriage and distribution of freights and freight-cars, shall apply to any carrier, unless or until the aggregate receipts for the carriage of freights on the carrier's line shall amount to thirty-three and one-third per cent, or more, of the gross receipts of the business of such carrier for the preceding year, except as specified in said paragraph, or subdivision j.

The preceding part of the paragraph or specification provides that all carriers operating steam roads, as between themselves, and all carriers operating interurban roads, as between themselves, shall afford reasonable facilities at junction points for the interchange of business, and shall promptly forward, without discrimination, to destination on their lines or other lines all passengers and property, and the commission may in certain cases require steam and interurban roads to interchange cars, carloads and less than carloads, and for that purpose may require the construction at junction points of proper facilities, and the commission may also require the construction of switch and private track connections in certain cases.

There is no doubt that the legislature has the authority to classify the subjects of legislation when there is such difference in the situation or condition of things of the same general kind that a general law cannot, in the opinion of the legislative body, be made justly applicable alike to all.

The only limitation upon the legislative power to make such classification is that the cause for it must not be capricious, but must rest upon some substantial ground or reason existing in and arising from the subject-matter, and that the law passed in pursuance of such classification be so framed as to operate alike upon all within the class. When such reason appears to exist, the propriety of classification is purely a legislative question. *Indianapolis Traction, etc., Co.* v. *Kinney* (1909), 171 Ind. 612; *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 14 L. R. A. (N. S.) 418; *Pittsburgh, etc., R. Co.* v. *Montgomery* (1898), 152 Ind. 1, 69 L.

R. A. 875, 71 Am. St. 300; *City of Indianapolis* v. *Navin* (1898), 151 Ind. 139, 41 L. R. A. 337; *Savannah, etc., Railway* v. *Savannah* (1905), 198 U. S. 392, 25 Sup. Ct. 690, 49 L. Ed. 1097; *Cotting* v. *Kansas City Stock-Yards Co.* (1901), 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92; *American Sugar Refining Co.* v. *Louisiana* (1900), 179 U. S. 89, 21 Sup. Ct. 43, 45 L. Ed. 102.

In the case of *Cotting* v. *Kansas City Stock-Yards Co., supra,* it was said by Mr. Justice Brewer: "So again exercising the undoubted right of classification it may often happen that some classes are subjected to regulations, and some individuals are burdened with obligations which do not rest upon other classes or other individuals not similarly situated. License taxes are imposed on certain classes of business, while others are exempt. It would practically defeat legislation if it was laid down as a rule that a statute was necessarily adjudged invalid if it did not bring all within its scope, or subject all to the same burdens. It would strip the legislature of its inherent power to determine generally what is for the general interests, which interests may often be promoted by certain regulations affecting one class which do not affect another—certain burdens imposed on one which do not rest upon another."

Then, under the rule indicated, does there exist any natural and tenable reason for classifying railroads for the purpose of regulating their freight traffic?

It will be noted that the favor provision applies only to the handling of freight, and to a class of railroads whose income from freight carriage is less than one-third of the gross receipts from its combined business. So far as the handling of passengers and passenger-cars is concerned, all the regulations provided in the act apply alike to railroads of every class and character. It is only relating to freight traffic that a distinction is made. There is good reason for believing that the legislative purpose in the exception was to relieve electric interurban railroads from the labor and expense of

providing facilities for handling freight and freight-cars that seemed to be wholly unnecessary from the small amount of business done of that character. At the time the subject of the exception was before the legislature, in 1907, it was shown by the reports made by the railroads of the State to the Railroad Commission of Indiana, that there was not a steam road in the State, that held itself out as a carrier of freights, that did not receive more than one-half of its income from freight, and not an interurban electric road in the State that did not receive more than one-half of its gross income from its passenger traffic. It further appears from the same source that the freight receipts from all the steam roads operating in the State amounted to more than seventy-five per cent of the gross receipts of their business, and that the freight receipts of the electric interurbans amounted to less than ten per cent of their gross receipts.

As a further evidence of the legislative judgment and policy there was passed at the same session another act (Acts 1907, p. 434, §§5203-5218 Burns 1908) regulating the movement of loaded freight-cars, and other matters pertaining to the freight service, which act excepts from its operation all carriers whose income from freight business does not equal thirty-three and one-third per cent of their gross revenues.

It is very plain that there are radical differences between the steam and electric interurban railroads relative to their construction, their motive power, their grades, their curves, size of rails, of trains, of turnouts, inability to use each other's tracks, the facilities of interurbans for handling live stock and other heavy freights, their age and inexperience, their dominant purpose as shown by equipment, and their general inability to comply with freight regulations imposed upon steam roads. Add the fact that the freight business now done, or that may be done by them within their charter rights (*Kinsey* v. *Union Traction Co.* [1908], 169 Ind. 563, 612), is small, and attended with but little danger to em-

NOVEMBER TERM, 1909. 479

Chicago, etc., R. Co. *v.* Railroad Com., etc.—173 Ind. 469.

ployes or travelers. The extra hazards in the movement of large and heavy freight-trains, incident to steam roads, is absent from the slower single-car movement of the interurban. Besides, interurban electric roads are young, and yet in the experimental stage as freight carriers. The exception stated in the statute is tentative. It is conclusive only against roads whose receipts from freight equal one-third or more of the gross receipts of the business. Those now exempt will pass under the operation of the law as soon as the magnitude of their freight business reaches that stage which the legislature says should subject it to regulation. The regulative class is one into which any carrier may advance, or from which any carrier may recede. Relating to this point, Justice Brewer, in the case of *Ames* v. *Union Pac. R. Co.* (1894), 64 Fed. 165, said: "The right to classify is conceded, but it is said that this classification is arbitrary, and depends upon no fair and reasonable difference. Attention is called to the fact that since January 1, 1889, the Rock Island Company has built a road from Omaha to Lincoln, which is a part of its main line from Chicago to Denver; that in all of its business the Rock Island Company is in active competition with the several companies whose roads are subject to the provisions of this act; and that it is an unreasonable, unjust discrimination to exempt the Rock Island Company from like subjection. I cannot concur in these views. The principle of classification adopted by the legislature, whether wise or unwise, is within its power. To divide railroads into two classes, placing in the one all that have been constructed and in operation for a length of time, and whose business must therefore be presumed to have been thoroughly established, and in the other all only recently constructed, is clearly not a mere arbitrary distinction; and this notwithstanding it may be that one of the recently constructed roads is so fortunate as to have immediately secured a large business. The 'protection of infant industries' is a term of frequent use in the political discussions and history of this country; and to rule that a classi-

fication based upon such principle is purely arbitrary, and therefore unconstitutional, would certainly be a judicial novelty.''

In the case of *Covington, etc., Turnpike Road Co.* v. *Sandford* (1896), 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560, it was held that turnpikes might be classified in an act regulating and restricting the tolls that might be charged by the several classes.

A statute of Massachusetts, requiring street railway companies to carry school children to and from public schools for one-half the regular fare, and which excepted from its operation the Boston Elevated Railway Company, was held to be a constitutional classification both as to carriers and to the children carried. *Commonwealth* v. *Interstate, etc., St. R. Co.* (1905), 187 Mass. 436, 73 N. E. 530, 11 L. R. A. (N. S.) 973.

The Nevada rate law, which provides that the railroad commission may permit all narrow-gauge railroads to charge a rate not exceeding 150 per cent higher than that allowed broad-gauge railroads, and that the maximum rate should not apply to any railroad until such road has been constructed and in operation for two years between freight delivery points, was sustained. It is said in the course of the opinion in the case of *Southern Pac. Co.* v. *Bartine* (1909), 170 Fed. 725: ''The statute differentiates between old railroads, which presumably have an established business, and recently constructed roads, presumably with a business yet to be developed. It also segregates the broad-gauge railway, with its capacity for handling immense loads and enormous traffic, from the narrow-gauge railroad with its short haul, short trains, small engines, light traffic, and relatively large expense for train crews. These differences furnish a reasonable basis for a higher maximum freight charge in one case than in the other, and therefore justify the classification which is attacked.''

As sustaining its contention, appellant relies chiefly on the

opinion in the case of *Cotting* v. *Kansas City Stock-Yards Co., supra.*

In 1897 the legislature of the State of Kansas passed an act defining what should constitute a public stock-yard, and regulating all charges thereof, which act provided that any stock-yard which, for the preceding twelve months, shall have had an average daily receipt of not less than 100 cattle, or 300 hogs, or 300 sheep, should be declared a public stock-yard, and should charge the owner of animals consigned to it for sale not more than a certain fixed schedule of prices for privileges, service and feed, which schedule was about 50 per cent less than the prevailing charges.

The opinion in the case referred to presents a strong argument against a classification based upon the amount of business done, but the court does not seem to rest it upon that foundation. It is said by the writer, at page 102 of the opinion, that "it may be assumed from the record that the legislature of Kansas, having regard simply to the stock-yards at Kansas City, and the volume of business done at those yards, passed this act to reduce their charges." Six of the justices join in the following limitation: "We assent to the judgment of reversal—so far as the merits of this case are concerned—upon the ground that the statute of Kansas in question is in violation of the 14th amendment of the Constitution of the United States, in that it applies only to the Kansas City stock-yards company and not to other companies or corporations engaged in like business in Kansas, and thereby denies to that company the equal protection of the laws."

The limitation of the opinion just quoted from was again emphasized by a unanimous bench in the case of *St. Louis, etc., Coal Co.* v. *Illinois* (1902), 185 U. S. 203, 22 Sup. Ct. 616, 46 L. Ed. 872, wherein it was held that a law providing for inspection of coal mines is not unconstitutional, by rea-

son of its limitation to mines where more than five men are employed at any one time. Referring to the case of *Cotting* v. *Kansas City Stock-Yards Co., supra,* it was said, at page 208, that the Kansas statute "was held to be unconstitutional, because it applied only to one particular company."

Attention is again called to the same limitation in the case of *McLean* v. *Arkansas* (1909), 211 U. S. 539, 29 Sup. Ct. 206, 53 L. Ed. 315. It is obvious from the last two cases cited that the federal Supreme court has been considerate in directing attention to the true scope and limits of the case of *Cotting* v. *Kansas City Stock-Yards Co., supra,* and to the point that the ruling on the facts in that case is not in conflict with the long line of decisions of that court affirming the constitutional authority of the legislature to make such a classification of subjects for legislative purposes as are not capricious and arbitrary, but founded on substantial reason, and believed by the lawmakers to be demanded by some public interest.

The railroad commission act of 1905 wholly exempted interurban railroads from its operation, and the Appellate Court, being vested with jurisdiction to determine the validity of the law, in the well-reasoned opinion of *Southern R. Co.* v. *Railroad Com., etc.* (1908), 42 Ind. App. 90, held that the classification was well founded and fully supported by authority.

For additional instructive cases on the subject of classification, see *Chandler Coal Co.* v. *Sams* (1908), 170 Ind. 623; *Pennsylvania Co.* v. *State* (1895), 142 Ind. 428, 439; *State* v. *Hogreiver* (1899), 152 Ind. 652, 45 L. R. A. 504; *Erb* v. *Morasch* (1900), 177 U. S. 584, 20 Sup. Ct. 819, 44 L. Ed. 897; *Petit* v. *Minnesota* (1900), 177 U. S. 164, 20 Sup. Ct. 666, 44 L. Ed. 716; *Tullis* v. *Lake Erie, etc., R. Co.* (1899), 175 U. S. 348, 20 Sup. Ct. 136, 44 L. Ed. 192; *People, ex rel.,* v. *New York State Board, etc.* (1905), 199 U. S. 1, 25 Sup. Ct. 705. 50 L. Ed. 65.

We believe the facts here involved clearly carry the case at bar within the class sanctioned by the Constitution, and that the trial court committed no error in so holding.

The petition for a rehearing is overruled.