## HUGHES v. INDIANA UNION TRACTION COMPANY.

[No. 8,309. Filed June 3, 1914. Rehearing denied October 15, 1914. Transfer denied November 17, 1914.]

1. STATUTES.—*Construction.*—*Intent.*—In construing a statute, the court will seek to discover and carry out the legislative intent, and in so doing will look to each and every part of the statute, to the circumstances under which it was enacted, to the old law, if any, upon the subject, to other statutes upon the same or relative subjects, whether in force or repealed, to contemporaneous legislative history, and to the evils to be remedied. p. 215.

2. MASTER AND SERVANT.—*Employers Liability Act.*—*Construction.* —*Interurban Railroads.*—Since the Employers Liability Act (§8017 Burns 1914, Acts 1893 p. 294) declaring that every railroad or other corporation shall be liable for personal injuries suffered by any employe in specified cases, is unconstitutional in so far as it is intended to apply to corporations other than railroad companies, and since, in view of the distinction maintained between railroads and street or interurban railroads throughout legislative and judicial history on the subject, as well as the physical differences in the construction and operation of such roads, street and interurban roads can not be held to be "railroads" within the meaning of the term as used in said act, there can be no liability thereunder against an interurban railroad company. p. 215.

From Howard Circuit Court; *William C. Purdum,* Judge.

Action by Earl Hughes against the Indiana Union Traction Company. From a judgment for defendant, the plaintiff appeals. *Affirmed.*

*Dan Waugh, Harness, Moon & Voorhis* and *Gifford & Gifford,* for appellant.

*J. A. Van Osdol* and *Blacklidge, Wolf & Barnes,* for appellee.

SHEA, J.—The amended complaint in this case alleges in substance the following facts: Appellee is a corporation organized under the laws of Indiana, and for the past eight years has been engaged in operating lines of railroad in Indiana from Indianapolis to Fort Wayne by way of Anderson, Muncie and Marion, and from Indianapolis to Logansport, Peru and Fort Wayne by way of Noblesville, Tipton and Kokomo, in all about 200 miles. Its roads are built on the usual grade and of the usual gauge, ties and rails that are used in the construction of railroads where the motive power used is steam. The lines of road are not built on the public highways, but are constructed over rights of way owned by appellee, and through private property and farms, without reference to highways. Appellee has passenger depots at the main towns along its lines, where it maintains ticket offices. It also has freight and express depots at important points, receives freight and express matter and ships same. Appellee has regular, scheduled, through trains that are very heavy and of great carrying capacity, accommodating one hundred or more passengers, which are scheduled to and do run at a speed of from twenty-five to seventy-five miles per hour. Each train consists of one or more cars, and appellee has carried over its lines for the past eight years large freight and express cars loaded with merchandise, live stock, gravel, broken stone and drainage tile. The trains carrying broken stone, gravel and tile are composed of from one to six or seven cars. All passenger and freight traffic is carried on by appellee for revenue and it operates its system as a commercial railroad. The motive power used by appellee is electricity, produced at its power station at Anderson, Indiana. In order to keep its power system in repair, and efficient, appellee had a line car and a crew of

workmen on same to make necessary repairs to wires, poles and other equipment. Appellant was in appellee's employ as motorman on its line car No. 635. One Wert was employed on the car as conductor, electrician and mechanic, and one Crum as brakeman and assistant electrician. Wert had full control of the loading and unloading of the car, and of its movements from one point to another, subject only to orders of the chief electrician at appellee's head offices at Tipton and Anderson, and the train despatcher at Tipton. It was appellant's duty to obey the orders of Wert with reference to the movements of the car, and he had no control over the loading of the tools and repairs and no knowledge of such loading, his duties being confined exclusively to operating the motor and propelling the car from place to place. On August 13, 1908, Wert, in obedience to orders from appellee, directed appellant to run the car from Kokomo to Galveston, a distance of about eight miles. There was a cab or house situated in the middle of the car, and in the discharge of his duties appellant's presence was required in this cab, and his attention necessarily was given to the motor and observation of the tracks over which he was running the car. The car to his back was loaded with rolls of wire, ropes, ladders, cross arms and four or five pike poles. The latter were wooden poles about twelve feet long and two inches in diameter, with an iron spike in one end. There were no side boards or standards along the edge of the work car, and no devices of any kind or character to prevent the poles from jolting and falling off when the car was in motion. The poles at the time were placed upon the car without any fastenings or devices to hold them in position. There were loops and staples in the car in which the standards with side boards attached could have been placed, which would have prevented the poles from falling. Appellee carelessly and negligently, with knowledge of this defective condition, ordered the conductor to move the car so loaded at a very high rate of speed, to wit, fifty miles per hour. While

making the trip, and running the car according to appellee's instructions from forty to fifty miles per hour, and while appellant was giving his full attention to the motor, with his back to the portion of the car loaded with poles, one of the poles, by reason of the jolting of the car and the motion thereof, and by reason of the carelessesss and negligence of appellee in failing to secure the poles, worked off the car and the end with the spike in it falling first, was caught in the ground and by the motion of the car was thrown forward with great force, crashing through the cab window and striking appellant on the back, seriously injuring him. "That said injury was caused by the carelessness and negligence of the defendant in failing to have said poles fastened and secured upon said car, so that the same could not fall therefrom while the said car was in motion; by the carelessness and negligence of the defendant in failing to provide said car with such means and appliances as were necessary to keep said poles upon said car while the same was in motion, and by reason of the carelessness and negligence of the defendant in starting to move said car at a high rate of speed loaded with said poles in an insecure and unsafe position so that they were liable to fall and could fall from said car, and by the defendant's carelessness and negligence in allowing and permitting said poles to jolt and roll from said car while said car was in motion." It is further alleged that in the management of the car appellant was entirely ignorant of the proper methods of loading same, or of placing the materials thereon; that said duties were exclusively those of the conductor and his helper. It was the conductor's duty to see that the materials, tools and implements were placed thereon and properly secured; that appellant had no experience or knowledge regarding the loading of the car, and on the day had no knowledge of the condition of the poles or that they were not properly loaded and secured; that he had no knowledge that the poles were on the car at all; that his injury is permanent and that he is

entirely incapacitated from any work whatever, and will never be able to perform any labor.

Appellee's demurrer to the complaint was sustained, and judgment rendered that appellant take nothing and appellee recover costs.

The question presented and contended for by appellant in his brief is that the Employer's Liability Act, §8017 Burns 1914, Acts 1893 p. 294, applies to employes of interurban railroads, and that the complaint states a cause of action within its provisions. That question alone is considered, although many alleged infirmities in the complaint are presented by appellee's counsel, even though it might be held that the Employer's Liability Act, *supra,* has application. These we need not consider in view of the conclusion we have reached.

The history of the legislation authorizing the construction of steam railroads, as well as street and interurban railroads is proper to be considered upon the question of the application of the Employer's Liability Act presented, and the intention of the legislature with respect thereto. 1 R. S. 1852 p. 409 contains an act for the "incorporation of railroad companies". Later and while said act was in force, an act was passed for the "incorporation of street railroad companies." Acts 1861 (s. s.) p. 75, §§4143-4152 R. S. 1881, which as amended (Acts 1897 p. 163, Acts 1897 p. 201, Acts 1899 p. 230, Acts 1901 p. 119) now appears as §§5450-5458 Burns 1901. Interurban railroad companies are organized under this act as later amended and extended. In 1865 (Acts 1865 p. 63, 2 R. S. 1876 p. 755) it was provided that any street railway company "operating such road within any of the incorporated towns or cities of the State, and desiring to extend their road beyond such town or city limits, on any State or county road, or other public highway, may do so after procuring the consent of the Board of County Commissioners of such county." By an act of the legislature approved March 29, 1879 (Acts 1879 p. 175, §4, §4155

R. S. 1881), the powers granted by the act of March 6, 1865, were enlarged so that lines might be built outside of cities or towns, regardless of whether the constructing company was operating a line within a city or town. This act contains the following declaration: "Whereas, there is no law allowing persons or corporations to build horse or street railways outside of city limits, except to those companies organized for the purpose of building street railways inside of towns and cities, who are allowed to extend their line outside thereof, and it being important that several extensions of street railways be made to extend to fair grounds, neighboring towns, and other important localities, which are situated out of certain corporate limits, it is declared an emergency exists for the immediate taking effect of this act", etc.

This law remained in force in so far as it affects the question now involved until 1891 (Acts 1891 p. 109, §5454 Burns 1894), when an act was passed providing that every "company organized under the provisions of this act and owning and operating a street railroad within any city having a population of one hundred thousand * * * shall permit the use of its track or tracks by any incorporated suburban passenger railway company from the corporate limits of such city or town to some central point in such city or town" on the payment of compensation, etc. The provisions of this act are substantially repeated in the act approved March 2, 1899 (Acts 1899 p. 230, §5454 Burns 1901), in which, however, the entering company was called an interurban company instead of a suburban company, the privileges being conferred in cities of from 35,000 to 49,000 population.

At the same session of the General Assembly another act was passed covering the subject-matter of street railroads in cities the population of which exceeded 100,000 (Acts 1899 p. 260, §§5458c, 5458d Burns 1901), containing provisions similar to those contained in the act of March 5, 1891. In this act (§5458d, *supra*) the entering company is referred

to as "any incorporated suburban or interurban railroad company". The power of eminent domain and other important powers were conferred upon "any street railroad company heretofore or hereafter organized under the laws of the state of Indiana, and desiring to construct, or having heretofore constructed, any interurban street railroad or any suburban street railroad." §5468a Burns 1901, Acts 1901 p. 461. Section 5468p Burns 1901, Acts 1901 p. 95, authorized the taking of a lease of "the road, equipment and plant of, any other street or electric railroad company of this state, or of any adjacent state." An enactment was also made that the word "railroad" in the act concerning taxation (Acts 1891 p. 199), for all purposes of taxation should include "every kind of street railroad, suburban railroad or interurban railroad", thereby indicating that unless its meaning was thus extended the word "railroad" would not include street railroads. §8506a Burns 1901, Acts 1901 p. 121. By §5450 Burns 1901, Acts 1901 p. 119, the original act of 1861 was amended so as to expressly provide for the incorporation of companies to operate in more than one city or town.

In 1903 several important statutes were enacted, including the following: An act enlarging somewhat the powers conferred by the Act of March 11, 1901. Acts 1903 p. 92, §5675 Burns 1914. An act amending the consolidation act of 1901. Acts 1903 p. 181, §5690 Burns 1914. An act providing for drinking water and water closets on interurban cars running more than eighteen miles. Acts 1903 p. 250, §5684c Burns 1914. An act compelling the fencing of interurban and suburban railways. Acts 1903 p. 426, §5707 Burns 1914. An act providing for the crossing by "any street railroad company" with its "street railroad, interurban street railroad or suburban street railroad" of the tracks and right of way in this State of any railroad company. Acts 1903 p. 125, §5666 Burns 1914. This crossing act gave to steam railroad companies no reciprocal right to cross interur-

ban tracks, but it is provided in §5 (Acts 1903 p. 125, §5670 Burns 1914), that either company may compel the separation of grades. The difference in physical conditions and the operations of the two kinds of railroads were, however, recognized by the following provision in relation to the judgment which the court might make ordering the separation: "The court shall not order the construction of a heavier grade than a two per cent grade on such street railroad, interurban street railroad or suburban street railroad without the consent of such street railroad company; neither shall a grade of any steam railroad track be required that shall exceed the maximum or ruling grade governing the operation of engines on that division or part of the railroad on which the change is to be made, without the consent of the railroad company."

The word "railroad" was extended in the various railroad subsidy acts to include "every kind of street railroad, suburban street railroad or interurban street railroad". Acts 1903 p. 233, §5465 Burns 1908. An act was also passed authorizing any company organized under the several railroad laws, but operating or intending to operate as an interurban electric or street railway, to convert itself into an interurban or street railway with the unanimous consent of its stockholders, and on payment of the regular incorporation fees. Acts 1903 p. 271, §5219 Burns 1914. In 1905 provision was made regarding the manner in which "any interurban or street railway company" may obtain authority to build or extend its line on a county highway. Acts 1905 p. 521, §36, §7684 Burns 1914. The Railroad Commission Act also expressly provides that it shall not apply to street or interurban railroads except in certain specified respects. Acts 1907 p. 454, §5551 Burns 1914.

In 1907 several acts were passed relating to street railroads. Among them were the following: An act to compel any company operating "a line of interurban street rail-

road through any city having a population of thirty-five thousand or more'' to establish and maintain waiting rooms. Acts 1907 p. 54, §5683 Burns 1914. An act providing for certain kinds of safety appliances and conditions in case of steam railroads and other and different kinds of appliances and conditions in the case of interurban railroads. Acts 1907 p. 186, §5278 Burns 1914. An act amending the Railroad Commission Act of 1901, and among other things extending the jurisdiction of the Railroad Commission over interurban railroads. Acts 1907 p. 454, §5531 *et seq.* Burns 1914. In subd. j, §3 of this act, §5533 Burns 1908, it is provided that: ''All carriers subject to this act and operating steam railroads, as between themselves, and all carriers subject to this act and operating interurban or suburban railroads, as between themselves, shall afford all reasonable and proper facilities for the interchange of traffic between their respective lines at junction points. * * * Provided, That in special cases where it is practicable, and the same may be accomplished without endangering the equipment, tracks or appliances of any such carrier, the commission, upon application, may require any such steam and interurban or suburban railroad to interchange cars, carload shipments, less than carload shipments, and passenger traffic, and for that purpose may require the construction of physical connections at junction points, and the construction of switch and private track connections as provided in this act.'' Several important acts were also passed applying only to steam railroad companies, for instance, an act compelling the equipment of steam railroads with a block system. Acts 1907 p. 353, §5292 Burns 1908. The act above referred to requiring certain safety appliances and conditions. Acts 1907 p. 186, §5278 Burns 1914. The act of 1907 (Acts 1907 p. 584, §5299 Burns 1914) required steam railroads to have printed rules, and provided for the investigation of accidents. Many acts were passed by the legislatures of 1909, 1911 and 1913, all of which clearly

recognize the difference between interurban railroads and steam railroads, which the limits of this opinion will not permit us to set out in detail.

It is clear that the legislature by its enactments since 1861 has recognized a distinction between steam railroads and interurban railroads. In the first instance, although the steam railroad act was in full force and effect, it was deemed necessary to have an act enabling the incorporation of street railroad companies. Later, when the growth and development of business required the extension of street railroads until they became interurban railroads, legislative authority was deemed necessary, although the act for the incorporation of steam railroads was in full force and effect. The line of distinction has been very clearly kept in view throughout all the years of the existence of interurban railroads. Every privilege conferred, and every duty imposed on interurban railroads has been by legislative enactment, although in most instances kindred privileges and kindred duties had prior thereto been conferred on steam railroads. In every act of the legislature where it is intended that the privilege extended, or duties imposed upon steam railroads shall apply alike to interurban or street railroads, it has been stated, so that it is clear that the legislature had in mind at all times the inherent differences which exist, and that therefore separate and distinct legislation was necessary.

The distinction between steam railroads and interurban railroads thus recognized and followed by legislative enactment as shown herein has been uniformly recognized by the courts of this State where the question has been raised. An interurban railroad has been held to be entitled to construct its lines on public streets and highways across steam railroad tracks without obtaining the consent of, or paying compensation to the company owning such tracks. *Chicago, etc., R. Co.* v. *Whiting, etc., R. Co.* (1894), 139 Ind. 297, 38 N. E. 604, 47 Am. St. 264, 26 L. R. A. 337; *Chicago, etc., R. Co.* v. *Hammond, etc., Electric R. Co.* (1898), 151 Ind. 577,

46 N. E. 999.   In the case of *Wabash R. Co.* v. *Fort Wayne, etc., Traction Co.* (1903), 161 Ind. 295, 310, 67 N. E. 674, it was held that §5158a Burns 1901, Acts 1897 p. 237, of the general railroad law does not apply to street or interurban electric roads, but the latter are governed in proceedings to acquire a right to cross another railroad by §5468e Burns 1901, Acts 1901 p. 461, §5.   It has been held that an interurban railroad carrying passengers, light express matter, baggage and mails is not an additional servitude on city streets. *Mordhurst* v. *Fort Wayne, etc., Traction Co.* (1904), 163 Ind. 268, 277, 71 N. E. 642, 106 Am. St. 222, 66 L. R. A. 105, 2 Ann. Cas. 967.   In the case of *Cleveland, etc., R. Co.* v. *Feight* (1908), 41 Ind. App. 416, 84 N. E. 15, it was held that an interurban road occupies a street as a street railroad, and is not an additional servitude, and that it has the right on such street to cross the tracks of an intersecting steam road without having to resort to condemnation.   The same conclusion was reached by the court in the cases of *Michigan Cent. R. Co.* v. *Hammond, etc., Electric R. Co.* (1908), 42 Ind. App. 66, 83 N. E. 650; and *Pittsburgh, etc., R. Co.* v. *Muncie, etc., Traction Co.* (1910), 174 Ind. 167, 91 N. E. 600.   It was held in the case of *Kinsey* v. *Union Traction Co.* (1908), 169 Ind. 563, 81 N. E. 923 that an interurban railroad operated from Indianapolis to Marion and other points, carrying passengers and light freight, baggage and mails is not, when properly operated over city streets, an additional servitude on the fee.

An act authorizing interurban companies to condemn rights of way have been repeatedly upheld and enforced. *Union Traction Co.* v. *Basey* (1905), 164 Ind. 249, 73 N. E. 263; *Consolidated Traction Co.* v. *Jordan* (1905), 36 Ind. App. 156, 75 N. E. 301; *Indianapolis, etc., Traction Co.* v. *Larrabee* (1907), 168 Ind. 237, 80 N. E. 413, 10 L. R. A. (N. S.) 1003, 11 Ann. Cas. 695; *Fort Wayne, etc., Traction Co.* v. *Fort Wayne, etc., R. Co.* (1908), 170 Ind. 49, 83 N. E. 665,

16 L. R. A. (N. S.) 537; *Mull* v. *Indianapolis, etc., Traction Co.* (1907), 169 Ind. 214, 81 N. E. 657.

The distinction between steam railroads and interurban railroads is clearly made in the case of *Vandalia R. Co.* v. *Lafayette, etc., Traction Co.* (1911), 175 Ind. 391, 94 N. E. 483, 485, where the question was directly raised. The steam railroad contended that the legislature had acted arbitrarily in conferring power upon interurban railroads to acquire rights of way over its tracks by condemnation. It was insisted that the interurban railroads had been given rights not conferred upon steam railroads, and therefore there was an unreasonable grant of power. In response to this contention the court says at page 398: "Such an intent is not manifest, and can not be presumed to aid appellant's assault upon the statute in question. Other physical differences than these noted by appellant, and considerations of public interest, mark a line between steam railroads and interurban railroads, and the legislature at the time of considering the enactment, of the sections granting the right of the latter class of companies to cross the tracks of the former, must be presumed to have intended to adjust their relations in that respect with a view to promoting the public welfare, consideration of which is the primary authority in any case for delegating the sovereign power of eminent domain. That there is such an inherent difference between steam railroads on the one hand and those named in §5666, *supra,* and designated therein as 'street railroads, interurban street railroads or suburban street railroads', on the other, as justifies placing them in different classes for certain legislative purposes, is conceded by appellant to be settled. *Chicago, etc., R. Co.* v. *Railroad Com., etc.* (1910), 173 Ind. 469 [87 N. E. 1030, 90 N. E. 1011], and cases cited and reviewed."

In the case of *Indianapolis, etc., Transit Co.* v. *Foreman* (1904), 162 Ind. 85, 66 N. E. 669, it was held that the complaint did not state a cause of action under the Employer's

Liability Act, and that it was therefore unnecessary to decide whether said act applies to street interurban railroads. The court cites for a discussion of this question the cases of *Sams* v. *St. Louis, etc., R. Co.* (1903), 174 Mo. 53, 73 S. W. 686, 61 L. R. A. 475; and *Savannah, etc., R. Co.* v. *Williams* (1903), 117 Ga. 414, 43 S. E. 751; 61 L. R. A. 249. In the case of *Sams·v. St. Louis, etc., R. Co., supra,* in construing a statute which provides: "Every railroad corporation owning or operating a railroad in this state shall be liable for all damages sustained by any agent or servant thereof while engaged in the work of operating such railroad by reason of the negligence of any other agent or servant thereof" the court held that such statute does not apply to street railroads. In the case of *Savannah, etc., R. Co.* v. *Williams, supra,* the court held the master was liable for the injury of one servant inflicted by the negligence of a fellow servant. The court in that case bases its holding upon the fact that the legislative enactments made no distinction between steam railroads proper, and street railroads, and that they had been uniformly so treated by the courts. A like distinction has been maintained in other states. In the case of *Massillon Bridge Co.* v. *Cambria Iron Co.* (1898), 59 Ohio St. 179, 52 N. E. 192, it was held that the word "railroad" in the mechanic's lien law of that state does not include an interurban street railroad. See also the following cases: *Norfolk, etc., Traction Co.* v. *Ellington* (1908), 108 Va. 245, 61 S. E. 779, 17 L. R. A. (N. S.) 117; *Riley* v. *Galveston, etc., R. Co.* (1896), 13 Tex. Civ. App. 247, 35 S. W. 826; *Fallon* v. *West End St. R. Co.* (1898), 171 Mass. 249, 50 N. E. 536; *Lundquist* v. *Duluth St. R. Co.* (1896), 65 Minn. 387, 67 N. W. 1006; *Johnson* v. *Metropolitan St. R. Co.* (1904), 104 Mo. App. 588, 78 S. W. 275; *Stocks* v. *St. Louis Transit Co.* (1904), 106 Mo. App. 129, 79 S. W. 1176.

In construing a statute, the court will seek to discover and carry out the intention of the legislature in its enactment. In the search for that intention the court will look

to each and every part of the statute, to the circum-

1. stances under which it was enacted, to the old law upon the subject, if any, to other statutes upon the same subject, or relative subjects, whether in force or repealed, to contemporaneous legislative history, and to the evils and mischiefs to be remedied. *State Board, etc.* v. *Holliday* (1898), 150 Ind. 216, 233, 49 N. E. 14, 42 L. R. A. 826, and authorities cited; *Thorn* v. *Silver* (1910), 174 Ind. 504, 516, 89 N. E. 943, 92 N. E. 161; *Pennsylvania Co.* v. *Mosher* (1911), 47 Ind. App. 556, 562, 94 N. E. 1033.

It has been expressly held by the Supreme Court of this State that the act being considered, in so far as it is "intended to apply to other corporations" is unconsti-

2. tutional, because it imposes burdens on them not imposed on individuals or partnerships engaged in similar business, so that it can not be held that interurban roads come within the clause "other corporations" contained in the title as well as in the body of the act itself. *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 674, 80 N. E. 529, 14 L. R. A. (N. S.) '418; *Oölitic Stone Co.* v. *Ridge* (1910), 174 Ind. 558, 574, 91 N. E. 944; *Cleveland, etc., R. Co.* v. *Foland* (1910), 174 Ind. 411, 91 N. E. 594, 92 N. E. 185; *Richey* v. *Cleveland, etc., R. Co.* (1911), 176 Ind. 542, 96 N. E. 694, 47 L. R. A. (N. S.) 121. The reason for this distinction is obvious from the method of operation and the manner of construction of steam railroads as compared with interurban railroads. Steam railroads are engaged in carrying passengers and heavy freight for long distances, using long trains of cars operated by crews of four or more employes, having extensive terminals in various cities, with yard facilities, requiring the switching and shifting of cars, the making up of trains, accompanied by many dangers and hazards not incident to the operation of interurban trains, which are generally composed of one or two cars, with two or three employes, carrying passengers and light freight for comparatively short distances with comparatively small

terminal facilities, no switching of cars, generally speaking, and few of the dangers which are incident to the operation of steam railroads.

This court in passing upon the question directly, has held that subdivision 4 of the Employer's Liability Act, *supra*, has no application to interurban railroads. In the case of *Indianapolis, etc., Transit Co.* v. *Andis* (1904), 33 Ind. App. 625, 72 N. E. 145, the question is considered and determined by the court. In that case it was said: "Moreover, we must assume that when the legislature passed the employers' liability act of March 4, 1893, it was dealing with and acting upon existing facts within its knowledge. The mischief felt and intended to be remedied was then certainly known. It can not be assumed that the statute was passed before there was an apparent necessity for its enactment. When that act was passed, aside from street railroads in cities, steam railroads were the only railroads in operation generally, and the dangers arising from the operation of railroads were to a very large extent only such dangers as arose from the operation of steam roads. At that time there were few, if any, electric roads, as now known, in existence in this State. The reasons for changing the law relating to master and servant, as that act changed it, were at that time to be found in the many dangers to which the numerous persons engaged in operating steam railroads were exposed, and the many different departments of labor in which the workmen were employed. It is quite true that an electric railroad, as we now know such roads, might be called a railroad; but, as said in *Bridge Proprietors* v. *Hoboken Co.* [1863], 1 Wall. 116, 17 L. Ed. 571: 'It does not follow, that when a newly invented or discovered thing is called by some familiar word, which comes nearest to expressing the new idea, that the thing so styled is really the thing formerly meant by the familiar words. * * * The track on which the steam cars now transport the traveler or his property is called a road, sometimes, perhaps generally, a railroad. The

term road is applied to it, no doubt, because in some sense it is used for the same purpose that roads had been used. But until the thing was made and seen, no imagination, even the most fertile, could have pictured it, from any previous use of the word road. So we call the enclosure in which passengers travel on a railroad, a coach; but it is more like a house than a coach, and is less like a coach than are several other vehicles which are rarely if ever called coaches.' See, also, *Funk* v. *St. Paul City R. Co.* [1895], 61 Minn. 435, 63 N. W. 1099, 29 L. R. A. 208, 52 Am. St. 608; *Sams* v. *St. Louis, etc., R. Co.* [1903], 174 Mo. 53, 73 S. W. 686, 61 L. R. A. 475. In *Fallon* v. *West End St. R. Co.* [1898], 171 Mass. 249, 50 N. E. 536, in determining whether a street railway car operated by electricity upon a street railway track was a 'locomotive engine or train upon a railroad', the court said: 'But we think that by the words "locomotive engine or train upon a railroad" must be understood a railroad and locomotive engines and trains operated and run or originally intended to be operated and run in some manner and to some extent by steam. This undoubtedly was the sense in which the words were used by the legislature when the statute was enacted, and we do not feel justified now in giving to them the broad construction for which the plaintiff contends. Possibly a railroad, where the motive power has been changed in part or altogether from steam to electricity, or some other mechanical agency, but which retains in other respects the characteristics of a steam railroad, would come within the purview of the act. It is not necessary, however, to decide that question now. The defendant is a street railway operated by electricity, and running the usual street car in the usual manner. We think that the car belonging to it, and operated in the manner in which cars upon street electric lines usually are, can not be said to be a locomotive engine or a train upon a railroad within the meaning of the statute in question.' In discussing the expression 'upon a railway' as used in the act, the author of

Dresser, Employers' Liability §80, says that the expression 'means a steam railway or one originally operated as such. This section of the act was passed to meet the dangers arising from steam railroads, and it was enacted at a time before electric railways had been adopted, or street railways had become a source of peculiar danger.' See also *Whatley* v. *Zenida Coal Co.* [1898], 122 Ala. 118, 26 South. 124; *Jarvis* v. *Hitch* [1903], 161 Ind. 217 [67 N. E. 1057].''

In view of legislative enactments as well as the decided cases which have been cited, we are of the opinion that the language of the Employer's Liability Act as it now stands, was not intended in the first instance and is not now broad enough to include employes of interurban railroads within its purview. The demurrer to the complaint was therefore rightly sustained. Judgment affirmed.

NOTE.—Reported in 105 N. E. 537. As to the rules for the construction of statutes, see 12 Am. St. 826. For a discussion of "street railways" distinguished from commercial railroads, see 4 Ann. Cas. 449; Ann. Cas. 1913 C 579. See, also, under (1) 36 Cyc. 1128, 1137, 1147, 1152; (2) 26 Cyc. 1370.