THE LARABEE FLOUR MILLS COMPANY v. THE MIS-
SOURI PACIFIC RAILWAY COMPANY.*

No. 15,167.   (88 Pac. 72.)

SYLLABUS BY THE COURT.

1. RAILROADS — *Common Carrier — Discrimination.* Under the
facts of this case it is held that a railway company holding
itself out to the public as ready, and as undertaking, to do
switching which requires it to leave its own rails and right of
way and go upon the rails and right of way of another com-
pany, with which it has no express contract relating either to
compensation for switching or to track rights, is a common
carrier, and as such must switch cars without discrimination
against a disfavored shipper.

2. MANDAMUS—*Switching Service Wrongfully Discontinued.* If
the switching service described be wrongfully discontinued as
to a single shipper he is entitled to a writ of mandamus to
compel the carrier to resume it.

3. RAILROADS—*Discontinuance of Switching Service Not Ex-
cused—Parties in Equal Wrong.* A common carrier of the
kind described has no right to discontinue switching cars for
a shipper on account of his refusal to pay bills for car service
when the detention for which the charges were assessed was
occasioned as much by the fault of the carrier as by the fault
of the shipper.

4. —————— *Payment for Car Service—Unreasonable Regulation.*
A rule or order obliging a shipper to pay car-service charges
whether just or unjust, with no redress but to submit a claim
for the return of his money to the manager of the car-service
association promulgating the requirement, is not reasonable.

5. COMMERCE—*Internal Movement of Property—State Control.*
The internal movement of property is not freed from state
control until after it has been finally released by the con-
signor to a carrier for transportation to a destination fixed
beyond the state line; and under the facts of this case such
control is not lost until after the freight has been billed to its
destination.

6. —————— *Switching Loaded Cars—Preliminary Incident to In-
terstate Commerce.* The switching of cars, loaded with
freight afterward transported to another state, which is
purely local, which is independently contracted for, which has
no relation to the contract of carriage under which the freight

* Pending in the supreme court of the United States on a writ of error
allowed December 24, 1906.

is removed beyond the border of the state, which has no relation to the ultimate destination of the cars, and which begins and ends before the destination of any car handled is fixed, is a mere preliminary incident to interstate commerce and subject to state control.

7. MANDAMUS—*Other Remedy.* Under the facts of this case it is held that the writ of mandamus may issue notwithstanding the remedy afforded by proceedings before the board of railroad commissioners.

Original proceeding in mandamus.  Opinion filed December 8, 1906.  Writ allowed.

*Waters & Waters,* for plaintiff.

*Waggener, Doster & Orr,* for defendant.

The opinion of the court was delivered by

BURCH, J.: The plaintiff asks that a writ of mandamus be issued to compel the defendant to perform certain of its duties as a common carrier.  The facts as found by a commissioner appointed to take the testimony and report findings of fact are as follow:

"(1)  In the succeeding findings the Missouri Pacific Railway Company will be referred to as 'the Missouri Pacific'; the Atchison, Topeka & Santa Fe Railway Company as 'the Santa Fe'; the Missouri Valley Car Service and Storage Association as 'the car-service association'; and the plaintiff as 'the mill company.'

"(2)  Stafford is a flourishing town of 1600 people, in Stafford county, Kansas, surrounded by a large scope of country productive of large annual crops of wheat. The Missouri Pacific and the Santa Fe each have a line of railroad running practically east and west through Stafford, with freight and passenger stations and side-tracks and station facilities thereat.

"The mill company has, and for more than four years has had, a flouring-mill of 1000 barrels daily capacity, and continuously operates this mill except on Sundays. This mill is located alongside the tracks of the Missouri Pacific and a short distance from its freight station. The tracks and freight stations of the two roads are separate a distance of one mile, and the Santa Fe station and station facilities are one mile from the mill. The mill company ships from its mill over these two

roads substantially its entire product, three-fifths of which is so shipped out of the state of Kansas and into other states, and two-fifths to points within the state of Kansas. The mill company purchases a large portion of its grain at Stafford, which is delivered in wagons at the mill; and purchases a large portion of its grain at points distant from Stafford, all of which is shipped to it in car-load lots over these two roads, and delivered to it at the mill by the Missouri Pacific. The mill company sells its product to dealers, and the larger portion of its output is shipped to customers most conveniently reached by shipping from Stafford by the Santa Fe, and a large portion is shipped to customers most conveniently reached by shipping from Stafford by the Missouri Pacific.

"(3) The Missouri Valley Car Service and Storage Association is an unincorporated voluntary association of a number of railroad companies, having a manager and other employees. The object and the duty of this association is to represent, serve, protect the interest and enforce the rights of the members thereof in the matter of the interchange of freight-cars, the prompt loading, unloading and return of cars interchanged or delivered to shippers for traffic purposes. This association has been in operation for many years, and from a time prior to any of the transactions mentioned in this investigation, and its objects and operations and methods have been generally understood by commercial shippers by car-load lots, and generally acquiesced in as a proper instrument for securing to the shipping public the greatest amount of service from the available car supply of the roads composing it. The association has adopted and had in effect since January 1, 1904, a body of rules, a printed copy of which accompanies these findings.

"(4) The lines of the Missouri Pacific and the Santa Fe intersect at a point one mile distance westwardly from the mill and the Missouri Pacific station, and the same distance from the Santa Fe station. As near as practicable to the intersection the Santa Fe, in the year 1903, constructed at its own expense a transfer-track from a connection with its own to a connection with the Missouri Pacific line. At that point and for a half mile eastward the Missouri Pacific line is located in Prairie avenue, a public street of Stafford, and no part of the transfer-track is owned by the Missouri Pacific,

or on its right of way or private ground. No express contract is shown to exist between the two railroad companies requiring either to use or to permit the other to use the transfer-track, or requiring either to place empty or loaded cars thereon to be taken away or returned by the other. In order for the Missouri Pacific to take cars from the said transfer-track which had been placed thereon by the Santa Fe, or return such cars thereto, it is necessary for it to go entirely off its own track and right of way, both in going after cars standing on said Santa Fe transfer-track and in setting loaded cars on the same; the Missouri Pacific not owning and having no control over any part of the said track or of the right of way over which it passes.

"(5) Immediately after the construction of the transfer-track the Santa Fe began to place thereon empty cars to be by the Missouri Pacific taken therefrom and placed for loading with flour at the mill company's mill, or at such convenient position as to enable the mill company with its own force to place them at the mill for such loading. At the same time the Missouri Pacific began to take such empty cars from the transfer-track and place them for loading with flour at the mill, or in such position as to enable the mill company with its own force to place them at the mill for such loading; and, on notice that such cars were loaded ready for shipment, to return them to the transfer-track to be taken possession of by the Santa Fe. The practice in this matter was: When the mill company desired to ship flour from its mill by the Santa Fe it placed its order with the Santa Fe for the number of cars desired; the latter would place the cars on the transfer-track; the Missouri Pacific would place them at the mill, and when the cars were loaded return them to the transfer-track, charge the Santa Fe two dollars per car for the service, notifying it of the switching; the Santa Fe would take the cars, bill them to destination, collect all freight, and pay the Missouri Pacific its switching charges. In no instance did the Missouri Pacific issue bill of lading, way-bill, or receipt, or present or collect bills for freight or switching charges.

"(6) When the Santa Fe received cars loaded with wheat consigned to the mill company it placed them on the transfer-track; the Missouri Pacific placed them at the mill; the mill company unloaded the wheat from them and reloaded them with flour, and the same prac-

tice was followed as in the case of empty cars brought in from the Santa Fe.

"(7) In making its application to the Santa Fe for cars, in no instance did the mill company make a deposit of any part of the freight, and in no instance was a deposit of any part of the freight demanded. In receiving orders for furnishing, transfering or returning cars as hereinbefore outlined, in no instance was any distinction made between cars intended to be used in carrying flour to points out of the state and cars intended to carry to points within the state of Kansas.

"(8) The custom and practice described in the fifth and sixth paragraphs prevailed as to both empty and loaded cars from the time the transfer-track was constructed uninterruptedly until August 29, 1906; and prevails to the present time in favor of the mill company as to cars loaded with wheat consigned to the mill company; and still prevails in favor of all industries located on the Missouri Pacific at Stafford making shipments in or out over the Santa Fe in car-load lots, except the mill company.

"(9) I find as a fact that the Santa Fe and the Missouri Pacific hold themselves out and undertake to place for loading on the Missouri Pacific tracks located on the Missouri Pacific line at Stafford all cars furnished by the Santa Fe required for the shipment of freight in car-load lots out over the Santa Fe; and also hold themselves out and undertake likewise to place all loaded cars consigned over the Santa Fe to industries located on the Missouri Pacific at Stafford.

"(10) From December 12, 1905, to April 26, 1906, fifty-two cars, taken empty from the transfer-track by the Missouri Pacific and placed at or near the mill for loading, were detained after the expiration of forty-eight hours from seven A. M. of the day following their placing before they were loaded by the mill company and ready to be returned to the transfer-track. The total time of such detention was equivalent to the detention of one car eighty-six days. The agent of the Missouri Pacific, acting under the direction of the car-service association, which for this purpose represented both the Santa Fe and the Missouri Pacific, assessed against the mill company a car-service or demurrage charge of one dollar per day for each day each of said cars was so detained after the expiration of free time, which assessment amounted to a total charge of eighty-six dollars.

"From July 24 to August 14, 1906, twenty-nine cars loaded with wheat, taken by the Missouri Pacific from the transfer-track and placed at or near the mill to be unloaded and reloaded with flour, were detained after the expiration of the free time allowed before they were reloaded and ready to be returned to the transfer-track. The total time of such detention was equivalent to the detention of one car 104 days.

"The agent of the Missouri Pacific, acting as above, added to the free time to be allowed these cars to the extent of twenty-six days, for the reason that the Missouri Pacific wholly failed to do any switching or placing of cars on July 26, when there were five cars, and on July 27, when there were six cars, and on July 30, when there were fifteen cars requiring switching and placing; and thereupon assessed against the mill company car-service charges on account of such detention amounting in the aggregate to seventy-eight dollars.

"(11) After the car-service charges on the loaded cars had been assessed the agent of the Missouri Pacific, under instructions from the car-service association, demanded of the mill company the payment of the whole of the car-service charges assessed, both the eighty-six dollars on account of empty and the seventy-eight dollars on account of loaded cars. Thereupon the mill company offered to pay the eighty-six dollars on account of the empty cars, and refused to pay seventy-eight dollars on account of loaded cars, basing its refusal on the ground that the delay and detention of the cars was not caused by its fault but was caused by the defective, insufficient and inadequate service of the Missouri Pacific in placing the cars for unloading and reloading.

"The agent of the Missouri Pacific, under the instruction of the car-service association, refused to accept the eighty-six dollars or any sum less than the whole of the two amounts, and demanded the payment of the whole of the two amounts with the understanding that the mill company might present a claim for the return of any excess charges it claimed had been made, which claim would be investigated by the car-service association and, if it found excess or unjust charges had been assessed, the amount so found would be refunded to the mill company. The mill company still refused to comply with that demand.

"(12) On August 29, 1906, and after the mill company had refused to make payment of the entire claim

for car-service charges, the Missouri Pacific, by the direction of the car-service association, ceased and refused to make further delivery to the mill company of empty cars placed on the transfer-track for the use of the mill company by the Santa Fe, and still refuses to make such delivery. The only object and purpose of the car association in directing and of the Missouri Pacific in the refusal to make such further delivery of such empty cars to the mill company is to compel it to pay the whole of both amounts of car-service charges under the understanding described in paragraph 11, by the enforcement of the rules of the car-service association. The refusal to make such delivery was not based upon a claim that the compensation paid for the service was not satisfactory, nor upon a claim that any part of such service constituted a part of interstate commerce, nor upon a claim that the Missouri Pacific did not undertake to perform such service.

"(13) As a result of the refusal to make delivery of empty cars, as described in paragraph 12, the mill company, when desiring to ship any of its products from Stafford by the Santa Fe, is compelled to haul the same in wagons from its mill to the station of the Santa Fe and load into cars from wagons. This entails upon the mill company great inconvenience and great additional expense in the management of its business.

"(14) During the period covered by the car-service charges on loaded cars constituting the seventy-eight dollars so demanded, an unusual and heavy demand was being made upon the Missouri Pacific for the transportation to market of a newly harvested crop of wheat, then ready for market, along that portion of its line from Conway Springs to Larned in Kansas. The freight service on that portion of its line was performed throughout the year by a single engine and train crew, passing from Conway to Larned and return. The transfer and switching service performed by the Missouri Pacific, hereinbefore described, was performed by this single engine and crew. Ordinarily, and by the train schedule, this engine and crew passed through Stafford and performed such transfer and switching service once in the early part and once in the latter part of each day except Sunday; and when so performed with reasonable promptness and regularity this single engine and crew were capable of performing the service to the satisfaction of the mill company. The en-

gine so used was old, and frequently defective and out of repair. The single engine and crew were not sufficient or equal to meet the unusual demand of the business of that part of the line during the period mentioned and perform the transfer and switching service in question with promptness or regularity.

"During the period mentioned the mill company made its applications from time to time to the Santa Fe for such number of cars, in addition to the loaded cars consigned to it which it might reasonably anticipate would arrive at the same time, as it deemed necessary in its business, but not for a greater number of cars to be delivered at one time than, together with such loaded cars, it could load within the free time allowed if such empty and loaded cars were properly placed with reasonable promptness.

"(15) The crowded condition of the business on the Missouri Pacific during that period and the general character of its motive power and train crew were well known to its agent; as well, also, to the Santa Fe and to the mill company.

"When the mill company placed its applications for cars with the Santa Fe it could not certainly know the day on which they would be placed on the transfer-track, or know with certainty on what day loaded cars consigned to it over the Santa Fe would arrive and be placed on the transfer-track; or know that at such times such cars could not be properly placed by the Missouri Pacific with reasonable promptness, and removed when reloaded with like promptness. The Missouri Pacific did not better or increase its motive power or train service to meet the increased and unusual demand of its business during the period mentioned.

"(16) I find as a fact that the detention of the loaded cars beyond the free time allowed, on account of which the disputed car service to the amount of seventy-eight dollars was assessed against the mill company, was caused as much by the fault and defective motive power and insufficient train service of the Missouri Pacific as from any fault or omission on the part of the mill company."

Section 2 of rule 9 and section 1 of rule 10 of the Missouri Valley Car Service Association read as follow:

"Sec. 2. On deliveries to private sidings, should con-

signees or consignors refuse to pay or unnecessarily defer settlement of bills for car service, the agent will decline to switch cars to the private sidings of such parties, notifying them that deliveries will only be made to them on the public delivery tracks of the company, after the payment of freight charges at his office. Agent will promptly notify manager of action taken."

"Sec. 1. The manager is authorized to entertain claims and refund car-service charges in special cases. Claims should be made direct to the manager, with paid car-service bills attached, and each claim should carry with it a full statement of the grounds upon which reduction of the car service is requested."

These findings narrow the controversy to the matter of taking empty cars from the transfer-track to plaintiff's mill and returning them when loaded.

It is argued that no contract exists between the defendant and the Santa Fe relating to the use of the transfer-track, and that the court cannot make one for them; that the defendant cannot be compelled to leave its own rails and its own right of way and go upon the rails and property of others to perform carriage services; and that the relief asked would indirectly require the defendant to devote a part of its main line to the use of the Santa Fe as a terminal. This argument does not reach the merits of the case. Under findings 8 and 9 the only question is if the plaintiff shall be given the same service afforded to other industries located at Stafford.

When the transfer-track was built the defendant was under no obligation to do switching over it or from it, either for the Santa Fe or for the shippers at Stafford. For the purpose of the discussion merely it may be conceded that it could not have been compelled to do so; that it had the absolute right to restrict its business to the operation of its own line, as it now restricts its service over the transfer-track to the handling of freight-cars. But it did not exercise its privilege. It voluntarily undertook to serve the public by switching cars, just as it voluntarily undertook, in the beginning,

to serve the public by operating its own road. It held itself out as a switching company and undertook to handle all cars loaded and empty which the shipping interests of Stafford required should pass over the transfer-track, although compelled to leave its own track and right of way in order to do so. It relied upon the implied contract of the Santa Fe to pay the value of the service performed. The Santa Fe participated in this public profession and undertook to devote its property and resources to the proposed end. This conduct on the part of the two roads was in no respect *ultra vires*. It was in direct furtherance of the public purposes of their incorporation, and having held themselves out to the general public as ready and willing to render the service described they assumed all the duties which the law imposes in view of the nature of the business and the customs incident to it. The defendant became, and under the findings still is, a common carrier of loaded and empty freight-cars to and from the transfer-track and its own station a mile away. (*Mo. Pac. Rly. Co. v. Grocery Co.*, 55 Kan. 525, 40 Pac. 899.)

It is Hornbook law that a carrier cannot renounce as against some disfavored shipper the public duty which it assumed when it engaged in the kind of transportation business which it offers to conduct. Being a common carrier for all, the defendant must switch all cars tendered for that purpose, including those intended for the mill company. It is equally elementary that a carrier may be compelled by mandamus to perform duties of this kind to an aggrieved shipper.

The findings of fact show that the plaintiff has not forfeited the right it claims. It is unnecessary to inquire if a carrier may discontinue all further service to a shipper on account of past infractions of reasonable rules adopted to secure better service to the public. Rule 9 of the car-service association does not provide for the infliction of any such penalty, but only re-

52—74 KAN.

quires that further deliveries shall be made on public delivery tracks and not at private sidings. Rule 10 in its application to this case and the special order issued for the purpose of coercing the plaintiff are not reasonable. A shipper ought not to be compelled to pay an unjust charge for car service with no redress but to submit a claim for the return of his money to the manager of the association promulgating the rule or order. The weight of authority seems to be that the carrier has a lien for compensation for the use of cars beyond reasonable free time. If the lien be waived the courts are open. But the car-service association holds no franchise to compel the payment of claims of this kind and then to decide for itself whether or not it will refund. And in any event a carrier cannot justly withhold its services when it is equally at fault in the matter of which it complains. (Finding 16.)

The defendant claims that an order restoring to the mill company the service it formerly received would regulate interstate commerce, so far as cars destined to points outside the state are concerned. It is plain that the taking of empty cars from the transfer-track and placing them at the mill is nothing more than preparation for the act of interstate traffic, which is to begin later. It needs a shipment of flour to initiate interstate commerce from the plaintiff's mill, and so long as the flour remains in the mill commerce has not begun. The mere purpose to use the cars in the future is not enough. They must be loaded with freight which is put in course of exportation before state control over them is suspended. (*Norfolk & W. R. Co. v. Commonwealth,* 93 Va. 749, 24 S. E. 837, 34 L. R. A. 105, 57 Am. St. Rep. 827.)

After a car has been loaded and returned to the transfer-track the Santa Fe may for lawful reasons decline to receive it. If it does receive it there is neither a consignee nor a destination for it until the mill company has given shipping directions. The preliminary stage has still not been passed. The move-

ment from the point of origin necessary to interstate commerce not only has not begun, but may never begin. As remarked by Mr. Justice Bradley, in the case of *Coe v. Errol,* 116 U. S. 517, 6 Sup. Ct. 475, 29 L. Ed. 715, "though intended for exportation, they may never be exported; the owner has a perfect right to change his mind." (Page 526.) The custody of the carrier is not impressed with the change which frees the goods from domestic control until after they have been finally released to it by the consignor for transportation to a destination fixed beyond the state line; and under the custom prevailing at Stafford this does not occur until the cars have been taken to the transfer-track, received by the Santa Fe, and finally billed. In the case of *Coe v. Errol,* already referred to, it was said:

"It is true, it was said in the case of *The Daniel Ball,* 10 Wall. 557, 565, 19 L. Ed. 999: 'Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced.' But this movement does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain. It may be sold or otherwise disposed of within the state, and never put in course of transportation out of the state. Carrying it from the farm, or the forest, to the depot, is only an interior movement of the property, entirely within the state, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself. Until shipped or started on its final journey out of the state its exportation is a matter altogether *in fieri,* and not at all a fixed and certain thing." (Page 528.)

There is still another test which may be applied.

The Missouri Pacific engine, for all practical and legal purposes, simply takes the place of the plaintiff's teams in moving flour from the mill to the Santa Fe. Its work is that of switching cars. The service is purely local. It is independently contracted for. It has no relation to the contract of carriage by virtue of which the freight is removed beyond the borders of the state. It has no relation to the ultimate destination of the cars handled. It begins and ends before the destination of any car is fixed, and is in fact nothing but a preliminary incident to the interstate journey. This being true, it is subject to state control. (*Pennsylvania R. R. Co. v. Knight,* 192 U. S. 21, 24 Sup. Ct. 202, 48 L. Ed. 325, and cases cited in the opinion.)

The facts in the case of *Chicago, M. & St. P. Ry. Co. v. Becker,* 32 Fed. 849, are in all essential respects analogous to those under consideration. The principles there applied are those which governed the decision of the supreme court of the United States in the Knight case, *supra.* The opinion reads:

"The case presented is this: In order to afford facilities to shippers, the complainant has constructed short lines of road, or side-tracks or switches, so called, from its yard or depot or main lines, running over and across the streets and highways to the various mills and manufacturing establishments in the city of Minneapolis; and its switches are so built as to enable it to take cars from the shippers at the mills, and deliver them to other lines of railway, or deliver cars to consignees received by it from other roads. When this service is performed, and the cars are to be transported from the city of Minneapolis over other roads, and when cars coming into that city over other roads are taken by the complainant over its own switches, and delivered to other roads or to consignees, a charge of one dollar and fifty cents per car is exacted for this switching service rendered, which is claimed to be reasonable and just; but if the cars are to be transported over its own line to the point of destination, or come into the city over complainant's main road, the service is free, and this separate and distinct charge, when made, is only for this local switching. This charge is not a part

of the through rate fixed and determined beforehand, and has no reference to interstate shipment. The transportation of cars over the switches from the warehouses or mills to the depot, or from the depot to these mills, can be regulated in many respects by the commissioners, and the rate for performing the service fixed by virtue of the police power of the state, in the same manner as the carriage by dray per load or distance is established for the public good. And I see no difference in the principle to be applied in such cases, although, incidentally, they may be connected with interstate commerce. The service is local, and there is nothing upon the face of the order of the commissioners indicating that it is intended to regulate interstate commerce. Even if it is conceded that this carrying of freight over the switches is an act of interstate commerce, it does not necessarily follow that the order of the commission affecting this traffic is in violation of the constitution of the United States. It is not every act that affects such commerce that amounts to a regulation of it, and this order fixing the price per car for service rendered, and to which the order applies, is not related to the contract for carrying the freight outside the limits of the state of Minnesota, and is not a part of it." (Page 854.)

The case of *Central Stock Yards Co. v. Louisville & N. R. Co.*, 118 Fed. 113, 55 C. C. A. 63, 63 L. R. A. 213, is cited by the defendant. The state of Kentucky attempted to seize upon shipments of live stock in the course of transportation by the railroad company from a foreign state and compel their delivery to a connecting carrier, in order that they might reach a particular stock-yard, although the transporting company provided adequate facilities for the delivery and care of stock at another yard in the same city. Manifestly that was an effort to regulate interstate commerce.

The case of *McNeill v. Southern Railway Co.*, 202 U. S. 543, 26 Sup. Ct. 722, 50 L. Ed. 1142, also cited by the defendant, is of the same character. The state of North Carolina undertook to control the disposition of freight while in transit from a foreign state. The following extract from the opinion is sufficient to show

the inapplicability of the decision to the facts under consideration:

"The cars of coal not having been delivered to the consignee, but remaining on the tracks of the railway company in the condition in which they had been originally brought into North Carolina from points outside of that state, it follows that the interstate transportation of the property had not been completed when the corporation commission made the order complained of. *Rhodes v. Iowa,* 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088." (Page 559.)

The defendant insists finally that a writ of mandamus should not issue against it because the plaintiff has a plain and adequate remedy under section 4 of chapter 340, Laws of 1905, conferring certain power and authority upon the board of railroad commissioners. It is not enough that a party have a plain and adequate remedy in order to deprive him of the right to the writ of mandamus. The remedy must also be one "in the ordinary course of the law." (Gen. Stat. 1901, § 5185.) A proceeding before the board of railroad commissioners is sufficiently out of the ordinary course of the law to distinguish it. Its characteristic feature is that it takes a mandamus suit in this court to complete the remedy. Otherwise it might not be adequate. Hence there is no reason why, in a case involving a right not of statutory creation and not depending upon any statute for its enforcement, the complainant may not apply directly to this court for the desired relief.

The peremptory writ of mandamus may issue, with costs to the plaintiff.

The court has authority to render judgment in favor of the plaintiff for any damage it has sustained. (Gen. Stat. 1901, § 5193.) The plaintiff is given ten days in which to file a claim for damages, stating separately the character and amount of each item. The defendant is given ten days after notice of the filing of the claim

in which to except to any items which it may deem not recoverable. The court will then pass upon the exceptions, if any be taken, and make orders respecting a hearing.

All the Justices concurring.