No. 22,959.

THE CLAY COUNTY COÖPERATIVE TELEPHONE ASSOCIATION, *Plaintiff,* v. THE SOUTHWESTERN BELL TELEPHONE COMPANY, THE UNITED TELEPHONE COMPANY, and THE COURT OF INDUSTRIAL RELATIONS, *Defendants.*

SYLLABUS BY THE COURT.

1. COURT OF INDUSTRIAL RELATIONS—*Successor of Public Utilities Commission—Jurisdiction—Method of Review of Its Orders.* Chapter 29 of the Laws of the Special Session of 1920, abolishing the public utilities commission, and creating the court of industrial relations, gives the court of industrial relations authority over two classes of subjects—regulation of public utilities, and regulation of industrial relations. On its public utilities side, the court of industrial relations is simply the successor of the public utilities commission, and orders made in the field of public utilities regulation are to be reviewed, as before, according to the public utilities act.

2. SAME—*Method of Review Provided by Statute.* Section 12 of the act of 1920 provides a method for the review of orders made in the field of industrial relations only.

3. SAME—*No Direct Appeal to Supreme Court.* There is no appeal from an order of the court of industrial relations direct to this court by notice of appeal given under the civil code.

4. SAME—*Mandamus—Adequate Remedy in Ordinary Course of Law.* It is the public policy of this state, established by the legislature, that any controversy which falls within the scope of the jurisdiction of the court of industrial relations on its public utilities side, shall be adjusted there, subject to such review by the courts as the public utilities act prescribes; and the section of the civil code providing that the writ of mandamus may not be issued in any case where there is a plain and adequate remedy in the ordinary course of law, must be interpreted accordingly.

5. TELEPHONE COMPANY—*Desiring Physical Connection with Another Company—Application to Court of Industrial Relations.* A telephone company claiming the right to compel physical connection of its system of lines and exchanges with the switchboard of another telephone company, by virtue of provisions of the public utilities act, has a plain and adequate remedy in the ordinary course of law, by application to the court of industrial relations.

6. SAME—*Right of One Telephone Company to Compel Switchboard Connection with Another Company.* Because two telephone companies connect their systems of lines and exchanges on the switchboard of one of them, and give to each other telephone service under a contract, a third telephone company has no common-law right to connect its system of lines and exchanges with the same switchboard, on equal terms.

Appeal from the court of industrial relations and original proceeding in mandamus. Opinion filed June 12, 1920. Appeal dismissed; writ denied.

*R. C. Miller,* and *C. Vincent Jones,* both of Clay Center, for the plaintiff.

*J. W. Gleed, D. E. Palmer, J. M. Kinkel, F. S. Jackson,* all of Topeka, and *J. O. Wilson,* of Salina, for the defendants.

The opinion of the court was delivered by

BURCH, J.: The proceeding is one induced by an order of the court of industrial relations, denying an application to require switchboard connection between independent telephone systems.

The Coöperative company has an exchange at Clay Center, with an installation of 117 business phones, 262 residence phones, and 275 rural phones. It has recently purchased an exchange at Idana, a small city in Clay county west of Clay Center, and has a connection with that exchange. The United company has numerous exchanges and toll lines in Kansas, and toll-line connections with the lines of other companies serving Kansas and other states. It has an exchange at Clay Center, and has a toll-line connection with the Idana exchange, operated under contract. The Bell company has an extensive telephone system, with a toll line from Kansas City, Mo., through Topeka, Kan., to Clay Center. It owns a portion of the stock of the United company, and by agreement has its toll line connected with the switchboard of the United company at Clay Center.

The Coöperative company presented an application to the court of industrial relations for an order requiring switchboard connection at Clay Center between its lines and the lines of the United and the Bell companies. The ground of the application was that the public service and convenience of the patrons of the Coöperative company would be promoted, and the court of industrial relations was asked to fix liability for cost of the connections, and to fix compensation for the transmission of messages arising with and delivered through the several exchanges. The United company and the Bell company responded with a denial of jurisdiction in the court of industrial relations to make the orders applied for. They further averred that the relief sought would deprive them of property without due process of law, and would deprive them of the equal protection of the law, contrary to provisions of the constitution of the United States. Reserving these questions, the respondents then stated facts to show that from economic, operative, and other standpoints, the orders prayed for should not be granted. The action of the court of industrial relations was expressed in the following order:

"Now on this first day of April, 1920, the above entitled matter comes on for order by the court upon the complaint filed herein on the fifth day of November, 1919, and the evidence introduced in support of said complaint on the 19th day of February, 1920; and the court, being fully advised in the premises, finds that under the evidence and circumstances of this case it would be unreasonable for the court to order a connection be-

tween the lines of the complainant and the respondents, in the city of Clay Center, prayed for herein.

"IT IS THEREFORE BY THE COURT ORDERED: That the complaint of *The Clay County Coöperative Telephone Association, complainant, v. The Southwestern Bell Telephone Company and The United Telephone Company, respondents,* be, and the same is, hereby dismissed."

· The petition to this court prays that the court of industrial relations be required to enter a just, reasonable and lawful order in the premises, and so takes the form of a petition in mandamus, under section 12 of the act creating the court of industrial relations, which reads as follows:

"In case either party to said controversy should feel aggrieved at any order made and entered by said court of industrial relations, such party is hereby authorized and empowered within ten days after service of such order upon it to bring proper proceedings in the supreme court of the state of Kansas to compel said court of industrial relations to make and enter a just, reasonable and lawful order in the premises." (Laws Special Session 1920, ch. 29, § 12.)

Accepting this theory of the petition, the court is without jurisdiction. The statute creating the court of industrial relations bears on its face marks of the craftsmanship which framed it. Leaving out of account section 2, the statute is a complete act, covering an entirely new field of legislation, which for convenience may be called the field of industrial relations, cognizance of which is committed to a tribunal having an authority unique in American jurisprudence, exercisable according to an outlined procedure. Action of the new court in that field is reviewable according to the method prescribed in section 12. Thus considered, the statute has nothing to do with general regulation of public utilities, which was committed to the public utilities commission by the public utilities act (Laws 1911, ch. 238, Gen. Stat. 1915, ch. 97), and supplementary and amendatory acts. Had the new statute been enacted in this form, there would have been two tribunals, each having jurisdiction over a distinct and separate field. Section 2, and a tying-in sentence in section 4, were simply injected into this scheme of legislation. The result is, that while the public utilities commission was abolished, its jurisdiction was committed, in whole and intact, together with appropriate methods of procedure and review, to the court of industrial relations. While the court of industrial relations, under the molding power conferred by both the public utilities act and the new

law, will doubtless have but one procedure for itself, orders made in the public utilities field are to be reviewed as before, according to the method prescribed by the public utilities act, and orders made in the field of industrial relations are to be reviewed according to the method specifically prescribed by the new law.

That the foregoing interpretation is necessarily true in respect to the remedy provided in section 12 of the act of 1920, is proved by its phraseology. The language is "said controversy." The word "controversy" first appears in section 7, and there and elsewhere throughout the act means a controversy in the field of industrial relations. Section 13 is merely a special statute of limitation. Section 25, providing that the rights given and remedies afforded are cumulative, and providing that the act does not repeal other laws, is interpretative only, and does not contain creative legislation. Section 26 merely confers such incidental powers as may be necessary to make express grants effective.

In this instance the controversy has nothing to do with industrial relations falling within the scope of the body of the act of 1920. It falls within the scope of public utilities regulation according to the public utilities act, which is fully preserved, and the plaintiff should have followed the procedure there prescribed (Gen. Stat. 1915, § 8348).

The plaintiff filed an ordinary notice of appeal with the clerk of the court of industrial relations, and claims this court acquired jurisdiction of the cause by virtue of the notice, under the provisions of the code of civil procedure. From what has just been said it is obvious the notice was nugatory. The court of industrial relations, on its public utilities side, is just what the public utilities commission was.

The plaintiff argues that it is entitled to relief by writ of mandamus granted by this court, independently of the action of the court of industrial relations. The purpose of the writ of mandamus is to compel performance of a clear legal duty. It is said the defendants rest under the clear legal duty not to discriminate against the plaintiff by excluding its telephone system from physical connection with their telephone systems, because of certain provisions of the public utilities act. Without expressing an opinion on the subject, it will be assumed,

for the purpose of a decision, that this claim is correct. Nevertheless, an original action of mandamus is not the proper remedy.

The writ of mandamus may not be issued in any case where there is a plain and adequate remedy in the ordinary course of law (Gen. Stat. 1915, § 7647). This statute is merely declaratory of the common law. The plaintiff has a plain and adequate remedy by application to the court of industrial relations, as the legal successor to the public utilities commission. It is said, however, that such remedy is out of the ordinary course of law, and the case of *Larabee v. Railway Co.,* 74 Kan. 808, 88 Pac. 72, is cited. That case was decided many years ago, when public utilities regulation in this state was confined to railroads. A tribunal with the jurisdiction and powers of the court of industrial relations was beyond the range of legislative vision, and all remedies were regarded as unusual and out of the ordinary course which did not follow closely the ancient paths of law and equity. The case was one to compel resumption of a definite service under established conditions—switching cars from a mill—which had simply been discontinued. The court had nothing to do but to command restoration of the service. The case fell naturally within the ordinary jurisdiction of the courts in mandamus, and the court took jurisdiction at once. It is now clearly perceived that what is most needed in the field of business intercourse is expert administrative adjustment, and not court adjudication. Advancing step by step according to that principle, the legislature superseded the board of railroad commissioners with the public utilities commission, gave it authority to regulate public utilities generally, and then superseded the public utilities commission with the court of industrial relations, and gave it greatly amplified powers. The policy has become the settled policy of the state. It contemplates that any controversy which naturally falls within the scope of the jurisdiction of the court of industrial relations shall be adjusted there, subject to such review by the courts as the statute provides, and the mandamus statute must be interpreted accordingly. The present controversy is peculiarly one of the kind just referred to. The proposition is to compel partial amalgamation of independent, competing telephone systems. The court might order forma-

tion of the relation, if that were all, but the writ of mandamus, if issued, must prescribe the terms of the relation. Those terms involve switchboard changes, installation of connections, apportionment of cost, regulation of operation, service, rates, division of tolls, accounting, and other matters with which none but a body like the court of industrial relations is competent to deal. At the oral argument it was suggested by counsel for plaintiff that, after ordering the connection, the court should send the case to the court of industrial relations for adjustment of those details—a confession that mandamus is not a fit remedy, and that the court of industrial relations is the proper place to go for relief. Therefore, the court holds the plaintiff had a remedy in what the legislature has established as the ordinary course of law for such cases.

The plaintiff claims that, aside from the public utilities act, the rights which it recognizes and the remedies which it affords for the protection of such rights, the plaintiff has a clear legal right, and the defendants rest under a correlative legal duty, respecting the subject in controversy, under the common law. The court is of a different opinion.

There is no dispute that telephone companies are analogous to common carriers with respect to communication of intelligence, and are obliged to serve without discrimination all applicants for service within the field occupied. Likewise, there is no dispute that in the absence of statute, no telephone company is obliged to make an initial switchboard connection with any other. The question, however, is whether or not the United company, which has voluntarily contracted service connection with the Bell company, is compelled to permit general switchboard connection with any other telephone company which applies; and whether or not the Bell company, which has voluntarily contracted service connection with the United company, is compelled to establish the same relations with any other company which applies.

In the case of *State, ex rel., v. Cadwallader*, 172 Ind. 619, the supreme court of Indiana had before it for decision the question whether or not the owner of a telephone system, physically connected with another system under a working agreement, could discontinue service by means of the connection. It appeared that the owner admitted to his switchboard

lines from other exchanges. From that fact the court de-
duced certain conclusions, which, however, were not made
the basis for decision of the question. The court said:

"Such physical connection cannot be acquired as of right, but if such
connection is voluntarily made by contract, as is here alleged to be the
case, so that the public acquired an interest in its continuance, the act
of the parties in making such connection is equivalent to a declaration
of a purpose to waive the primary right of independence, and it im-
poses upon the property such a public status that it may not be dis-
regarded. (*Maham v. Michigan Tel. Co.* [1903], 132 Mich. 242, 93
N. W. 629.) . . . Appellee is furnishing to other exchanges in
West Lebanon direct connection and communication with their patrons
to other exchanges, and the same service requested by relator. Appellee
has thus fixed a classification of those similarly situated and affected.
(*Delaware, etc., Tel. Co. v. State, ex rel.* [1892], 50 Fed. 677, 2 C. A. 1.)
. . . The act of admitting the connection alleged, is equivalent to
a declaration that all will be admitted to the connection, on the terms
and conditions imposed as to one or more." (pp. 636, 641.)

This pronouncement has been restated as law by some text-
writers, has been favored by some case annotators, and has
been approved by some courts in disposing of controversies
which did not require decision of the question. The ruling
has been condemned by some courts in disposing of contro-
versies which did not require decision of the question, and
a contrary view has been indicated by other courts under like
circumstances.

The first observation to be made respecting the declaration
of the Cadwallader case is that it was dictum. The rights of
third persons who were not parties to the working agreement
and who were not seeking independent admission to the
owner's switchboard, were not involved. (*Pacific Telephone
& Telegraph Co. v. Anderson,* 196 Fed. 699.) Besides this,
the court said:

"We have given the cause this much attention because of its public
interest and character, but the judgment must be affirmed upon other
grounds." (p. 642.)

In the next place, the authorities cited to sustain the doc-
trine announced require consideration. In the Michigan case
cited, one telephone company bought the franchises and ex-
change of another, connected the two systems, and for a time
gave service to the subscribers to both. It then undertook to
discontinue service by means of the purchased system. A

subscriber having a term contract enforced his right.  In the Federal cases cited, the Postal Telegraph Company wanted a telephone in its office.  The Western Union Telegraph Company, like other subscribers, had a telephone, and the equal right of the Postal company to an office telephone was enforced by mandamus.  Further on in the opinion in the Cadwallader case, several decisions are cited in support of the proposition that all who are similarly situated must be served alike, but each decision is identical in principle with the one rendered in the Postal Telegraph Company's case.  With great respect for the Indiana supreme court, it is submitted that none of the cases cited sustains its declaration of principles.  They all deal with the rights of individual persons or corporations to residence or business telephones, and not with the rights of one telephone company to use the telephone system of another.  The result is, the declaration is not authoritative evidence of the common law.

The declaration contained in the Cadwallader case was expressly disapproved in the case of *Telephone Co. v. Telephone & Telegraph Co.,* 125 *Tenn.* 270.  In the opinion it was said:

"The case just referred to correctly holds, as we understand the law, that each telephone company under the common law is independent of all other telephone companies, save for the duty to receive and forward to any point on its line messages received from such other company or companies, and hence that it is not bound to accord to any such outside organization or its patrons connection with its switchboard on an equality with its own patrons; that such connection is a privilege to be accorded only as the result of contract, or in obedience to a statute.  We concur in the reasoning that an opposite rule would soon result in the practical confiscation of the larger plants having long-distance lines, since the motive would be insistent and irresistible in small companies organized for the purpose, or depleted and run down companies, to demand such connection; the maintenance of the long lines being without expense to them.  But we are unable to agree with the supreme court of Indiana that, if a contract for such connection be once made without the specification of any time for it to run, this connection cannot thereafter be severed without the joint concurrence of the companies so in combination; nor are we able to see how the exercise of the right of contract to effect such a joint traffic arrangement between two companies can confer any right upon other companies, not parties to the contract, to a participation in its benefits.  Such a rule, while in terms asserting the independent right of contract, denies its existence in fact."  (p. 283.)

In the case of *Telephone Co. v. Telephone Co.,* 147 *Mo.* App.

216, the court followed the decision in the Cadwallader case. The presiding judge filed a dissenting opinion, in which he made the discriminations indicated by the following quotations:

"Fairness and equality to all, favors or special privileges in the conduct of the business as a public business to none, is the life of the law. This is very far from letting another in the same line of business into a participation in that business, even if the owner, by his voluntary act, has chosen to let in some other. It is the public who is under the protection of the law and the courts. Neither are concerned in promoting the interests of one corporation as against another. . . .

"The trouble with the opinion of my learned brother, in my judgment, is, that two ideas are confused: One, the right of all the public to enjoy equal privileges with every one else of the public in the use of telephone service over defendant's line; the other, the right of the defendant, notwithstanding its contract with plaintiff, to allow another company, engaged in the same business, the same rights granted plaintiff; in short, the right to become a part of its system." (pp. 248, 249.)

The supreme court of the state of Missouri, in an identical case, overruled the court of appeals, and held that the dissenting opinion stated the law (*Home Telephone Co. v. Sarcoxie Telephone Co.*, 236 Mo. 114). The substance of the decision may be indicated as follows: In the absence of statute or contract, the relation of telephone company A to telephone company B in respect to service is simply that of an individual of the general public. Telephone company B may extend its field of operations by making a contract with telephone company C whereby their systems are connected. This having been done, the relation of telephone company A to the connected systems is that of an individual of the general public. The public service has been extended, but the private right of the individual has not been enlarged, and company A has no more right to appropriate the joint facilities of companies B and C to the extension of its own system than it had to connect with company B's system before the contract was made. After citing the statute of the state of Missouri regarding sufficient facilities for the dispatch of public business, and prompt and impartial service on demand or tender of usual charges, the court said:

"This section does not require physical connection between telephone lines. It does require such company to receive all messages from other telephone or telegraph lines and transmit them, as it likewise requires it to receive all messages from individuals. This does not mean that

such corporation must yield to a physical connection with its lines by a competitive company and permit the use thereof in that way. In such case and under this statute the telephone corporation or the telegraph corporation has no greater right than the individual. If the individual goes to the office of the telephone company and tenders payment for a message, the company must accommodate him. So, too, if a telegraph company or other telephone company goes in the capacity of an individual or corporate entity and demands a similar service, it must be rendered. But this does not mean that the telephone company must put up a switchboard for all such individuals or corporations desiring to do business with the telephone company. . . .

"The theory of the case at bar is that under the law the Sarcoxie company was compelled to grant physical connection to the Bell company, because it had arranged for such connection with a competitor of the Bell company. Under the railway cases cited, *supra*, this contention is not well founded." (pp. 133, 138.)

In the case of *Pacific Telephone & Telegraph Co. v. Anderson*, 196 Fed. 699, Rudkin, district judge, after referring to the Cadwallader case, said:

"When a public service corporation enters into private contracts with others in furtherance of its business, I find no warrant for holding that its public duties are in all cases extended to the full scope of the private contract.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"It is a common practice among railroads to permit other companies to operate trains over their lines on terms agreed upon between them; but it has never been held or intimated that by such an act a company loses all control over its property or obligates itself to grant similar privileges to every other company that may apply therefor. Any such rule would wrest from the proper officers of the corporation the power to manage and control its affairs, and would be destructive of private property rights.

"The defendant companies had therefore no right to demand a physical connection with the Anderson line simply because that right had been accorded to another, and they certainly have no such rights under the statute of this state, for that statute vests the power and discretion to direct physical connection in the public service commission." (pp. 703, 705.)

In the case of *Union T. & S. Bank v. Telephone Co.*, 258 Ill. 202, the court had under consideration a contract for exclusive telephone connection. In the opinion it was said:

"Without the contract the telephone company would be at liberty to contract with both the Kinloch and Bell systems for long-distance connections. . . . Such service, however desirable, is now impossible. It will continue to be impossible unless contracts can be made with both long-distance companies. These contracts cannot be compelled, but none

of the corporations can by any contract deprive themselves of the power to make them. It may be that the telephone company cannot be compelled to give long-distance service or to connect its exchange with any other system, or, having connected with one system, to permit a connection with another. It may decline to undertake any service which cannot be begun and completed over its own lines. If it does undertake such service, it may. select its own lines and it may confine itself to one agent, but it may not bind itself to do so and contract away its right and power to use more than one agency." (p. 209.)

This case is erroneously cited in Jones on Telegraph and Telephone Companies (2d ed.), page 364, note 113, as sustaining the particular doctrine of the Cadwallader case under discussion.

In the case of *The People v. Telegraph Co.*, 166 Ill. 15, the syllabus reads:

"The fact that a telegraph company has an arrangement with one telephone company whereby verbal messages are transmitted and received over the telephone line, does not operate as a waiver of its right to refuse verbal messages over the line of another telephone company."

In the opinion it was said:

"The only serious question is whether the fact that the defendant has waived its right in that respect as to the other telephone company requires a like waiver on its part as to the relator, and we do not think that it does. It may be willing to assume risks with another telephone company of whose responsibility it may be satisfied, which it would not be willing to assume with the relator, for proper and sufficient reasons. Such arrangements are founded entirely upon the agreements of parties, and defendant is not bound to admit every other corporation into a like arrangement. This has been the rule as to carriers." (p. 21.)

These cases are sufficient to show substantial grounds of opposition to the views expressed in the Cadwallader case. It may be conceded they are not, in strictness, authoritative upon the precise question under consideration, but they are quite as much so as the decision in the Cadwallader case, to the force of which nothing has been contributed by any of the courts which have approved it.

Some of the courts which favor the doctrine of the Cadwallader case deny the analogy between physical connection of telephone systems and physical connection of railroad systems, in order to defeat the argument against connection founded on the railroad cases so frequently referred to. It is said that railroad connection involves much more complicated relations,

Telephone Association v. Telephone Co.

the things transported are essentially different—electric un-
dulations in one case, and physical objects in the other—and in
the case of telephone systems the communicants at each end
of the telephone wire do the transmitting.    In the case of
*United States Tel. Co. v. Central Union Tel. Co.*, 171 Fed. 130,
it was said:

"When it is said that a long-distance telephone company has no
right to compel a connection with a local telephone exchange belonging
to another company (which, of course, must be done, if at all, on reason-
able and fair terms to the local company), for the same reason that one
railroad company cannot be permitted to run its engines and cars loaded
with its freight on the lines of another railroad company, no account
is taken of the fact that the law as applied to railroad companies is a
law arising out of convenience and necessity; for it would be physically
impossible and unsafe for one railroad company to be permitted to run
its cars and engines, except with the consent of the other company, over
another company's lines.    This is an obvious fact."    (p. 143.)

If joint operation be in fact physically possible and safe and
for the public benefit, it does not make much difference how
the arrangement comes into existence.    The Rock Island Rail-
road Company has no track between Topeka, Kan., and Kan-
sas City, Mo.    It operates trains over the tracks of the Union
Pacific Railroad Company, under a contract, just as the
United company forwards its messages from Clay Center,
Kan., to Kansas City, Mo., over the line of the Bell company,
under contract.    If the officials of the two railroads were able
to make a contract which renders this operation of trains
possible and safe, it is conceivable a court or industrial com-
mission, with the aid of experts, might frame an order in
the terms of the contract.    In the case of telephone companies,
as in the case of railroad companies, there are physical con-
nection and use of physical property, maintenance of struc-
tures and way, operation, and accounting; and equality of
right may not be denied on the ground of mere inconvenience
arising from bigness and complexity of the business.    The
rural subscriber at his telephone on a fence post and iron-wire
line, talking to his mail-order house over long-distance, ob-
structs traffic as one freight train obstructs passage of another.
Under the proposed theory, as fast as new telephone com-
panies multiply and demand admission, the United company
must add to its switchboard, and the Bell company must en-
large and improve its facilities.    The Union Pacific company

can do the same thing. Every element on which right depends is as fully present in one kind of case as in the other; and if, as a matter of law, a telephone company, by admitting another to its switchboard under contract, dedicates that switchboard to general use by all who may apply, there is good reason to say the Union Pacific—simply another public utility for purposes of communication—dedicated its track to general use by its contract with the Rock Island company. On the other hand, if it be the law that the Union Pacific company waived nothing but its right to exclude the Rock Island company from use of its tracks and other facilities, the same rule should govern the relation of the parties to this suit.

It will be observed the court has not quoted from the decisions in the railroad cases, and the subject may be considered on principle, independently of those decisions.

Telephone companies which engage in the business of furnishing telephones or facilities for telephone communication, must serve the general public, within the field occupied, without discrimination. Individuals, whether persons or corporations, who desire telephones in their residences or places of business, or who desire to use telephone facilities, are members of the general public in that respect, and on the same footing.

Let it be assumed, for the purpose of analysis, that the United company established an exchange at Clay Center. Any one who desires a telephone is entitled to have one. Let it be assumed that the Coöperative company then established an exchange in Clay Center. Any one who desires a telephone of this company is entitled to have one; and each company is entitled to a telephone of the other, should it so desire. That service satisfies the public duty of each company. Patrons of the United company have no right, as individuals or in the name of the public interest, to demand that the United company furnish them with means of communication with patrons of the Coöperative group who do not patronize the United company. Patrons of the Coöperative company are in the same situation. Without a statute, facilities for communication between the two groups of patrons cannot be compelled.

Let it be, assumed that neither company has toll-line com-

munication with Kansas City, Mo. Patrons of neither company can demand, as individuals or in the name of the public interest, that facilities for such communication be supplied. Afterwards the United company builds a toll line to Kansas City. Patrons of the Coöperative company have no right to that service, except as they take a United company telephone or go to one of its booths, and have no right to demand that the Coöperative company build a line to Kansas City. Local relations between the two groups of patrons remain as they were before the toll line was constructed.

Instead of building a toll line to Kansas City, the United company buys one already built by the Bell company. The situation is the same as if the United company had built it. Instead of buying the line, the United company enters into a contract with the Bell company whereby both companies use it, and divide tolls on a satisfactory basis. The relation of the group of the public served by the Coöperative company to the United company and its toll-line connection is the same as if the United company owned the toll line. Patrons of the Coöperative company can subscribe for a United company telephone, or go to its booths. Members of the public in Topeka and Kansas City who desire to communicate with Clay Center, have a toll line to that place, and have at their disposal a local exchange serving the public—the exchange of the United company.

The Coöperative company extends lines into the country, and establishes a system of rural telephones. The rural patrons of the Coöperative company stand on the same footing as the city patrons of that company, so far as right of access to the United company's facilities is concerned. Besides that, those patrons have no right to call on the United company for a class of service which it does not profess to give. It has dedicated its capital and facilities to no service beyond the Clay Center city exchange and the toll-line connection with Kansas City.

The Coöperative company buys the Idana exchange, and connects it with the Clay Center exchange. The relation of patrons of the Idana exchange to the United company's exchange and toll line is precisely the same as that of the Coöperative company's rural patrons.

The United company extends its line northward to connect with exchanges at Morganville, Clyde, and Concordia. Nobody can complain because it did not choose to make southerly connections with Broughton, Wakefield, and Junction City.

These illustrations are sufficient to develop the subject. The result is that by building or buying a line to Kansas City, or by contracting for a line to Kansas City, the United company has made no classification of telephone users, and has discriminated against no group of telephone users whatever; and no telephone user, or group of telephone users, has any lawful ground for complaint. The patrons of one telephone system must go to the legislature to obtain authority to compel another telephone system to serve them.

The Bell company might have stopped its toll line at Topeka. If it had done so, Clay Center could not have complained of unjust classification or discrimination. No community beyond Clay Center can complain because the toll line stopped there. At Clay Center the Bell company furnishes toll service to Kansas City to all telephone users who may apply, and by virtue of its connection with the United company, furnishes exchange service to all telephone users who may apply. It has made no classification of telephone users, and has not discriminated against any telephone users.

So much for those individuals and groups of individuals for whose benefit telephone service is instituted and maintained. What about the relations of telephone companies organized to institute and maintain such service among themselves?

No amount of refinement on the nature of telephone communication and telephone service can disguise the fact that what the plaintiff seeks, and what any third company seeks, is use of the property, organization, and fruits of enterprise of the parties to the contract. The court is perfectly willing to say that by their contract the United company and the Bell company waived the independence they possessed before the contract was made. They cannot refuse to each other the service secured by the contract. The court is not able, however, to add to the extent of the waiver disclosed by the contract. To do so is to go beyond the intention of the parties and the factual results of the contract. To declare that the contract operates as a general waiver for the benefit of com-

Telephone Association v. Telephone Co.

panies not parties to it is not to declare a fact, or inference of fact, at all. It is to attach a legal consequence. This legal consequence is not attached by way of applying well-understood principles of law to a novel state of facts. The state of facts is of a common kind, and the legal consequence is attached by application of a new rule of law of tremendous importance, special in its nature, and made out of whole cloth, which is legislation, and not adjudication.

There is no rule or presumption of common law that any third company ought to participate in the joinder of two others. No doubt there are telephone lines and exchanges which ought to be united. No doubt there are instances in which exchanges are formed for the sole purpose of pirating upon other systems. Each case of proposed physical connection must be considered on its merits, and the subject of compelling involuntary physical connection between different telephone systems cannot be dealt with except by some agency acting under special legislative authority.

The decision is, the plaintiff has no remedy by virtue of section 12 of the act of 1920, no remedy by appeal according to the code of civil procedure, and whatever right it may have by virtue of the public utilities act should be vindicated by invoking the remedies there provided. The plaintiff has no common-law right on which to predicate the proceeding. Therefore, the appeal is dismissed, and the writ of mandamus is denied.